**KINKEL v. McGOWAN, Collector of Internal Revenue.**

Civ. A. 1347.

United States District Court
W. D. New York.

Sept. 22, 1949.

44

Edward G. Kinkel, of Buffalo, N. Y., for plaintiffs.

George L. Grobe, U. S. Atty., R. Norman Kirchgraber, Asst. U. S. Atty., both of Buffalo, N. Y., Theron Lamar Caudle, Asst. Atty. Gen., Andrew D. Sharpe and Benjamin H. Pester, Special Assts. to the Atty. Gen., for defendant.

KNIGHT, Chief Judge.

March Gold, Ltd., was a Canadian corporation. March Gold, Inc., was a Delaware corporation, which held all of the stock of March Gold, Ltd., save twenty qualifying shares held by its directors and Goniagas Mines, Ltd., a Canadian corporation. For convenience March Gold, Ltd., will hereinafter be referred to as "Limited" and March Gold, Inc., will hereinafter be referred to as "Gold, Inc." "Ltd." operated a gold mine in the Dominion of Canada.

Plaintiff, Edward G. Kinkel, was employed as an attorney for "Gold, Inc." and "Ltd." in the years 1930, 1931 and 1932, and during these years received on account of such services three promissory notes in the aggregate amount of $10,150, secured by bonds of "Gold, Inc."

In 1931, "Limited" delivered a trust deed to the Trust & Guarantee Co., Ltd., on the mining property of that corporation, and it

was executed to secure the payment of an issue of $150,000 of 7% Sinking Fund Gold Bonds. The bonds given as collateral for the notes given Kinkel were from this issue. Other bonds went to other creditors of both "Limited" and "Gold, Inc." The total issue was $148,500. These bonds, together with those held by Kinkel as collateral, were turned over to the Royal Bank of Canada as security for an overdue obligation of "Ltd." to the Bank in the sum of $25,000.

In July, 1932, "Ltd." suspended all mining and milling operations. In April, 1933, the Workmen's Compensation Commission filed a lien against certain claims and improvements of "Limited" to satisfy an assessment of upwards of $12,000. The property of "Limited" was advertised for sale to satisfy this assessment. "Limited" defaulted on its bond issue and sinking fund requirements, and on May 20, 1933, the Royal Bank of Canada instituted proceedings to foreclose. On foreclosure of the mortgage held by the Trust & Guarantee Co., Ltd., on the mining property of "Limited", a judgment of foreclosure was entered July 13, 1933. Plaintiff, Edward G. Kinkel, was appointed by the bondholders of "Limited" as the attorney with the authority to pledge the bonds with the Royal Bank of Canada and he was authorized to collect any surplus realized on the sale, provided there was a foreclosure, and thereafter divide it among the bondholders pro rata. As trustee for bondholders, plaintiff, Edward G. Kinkel, made a bid for the property of $100,000, payable $1,000 in cash and $99,000 by tendering $148,500 par value of bonds of "Ltd." Title was taken through one Thompson, Solicitor and Barrister, representing the Royal Bank of Canada, in a corporation named Marbuan Gold Mines, Ltd., which was organized on August 30, 1933. The last named corporation had an authorized capital stock of 1,000,000 shares. The shareholders of March, Inc., were given the right to subscribe to shares in the Marbuan Gold Mines, Ltd., in proportion to their holdings in March, Inc. 371,250 shares of Marbuan Gold Mines, Ltd., were delivered to the shareholders of "March Gold". On July 26, 1933, plaintiff, Edward G. Kinkel, received 25,375 shares in Marbuan Gold Mines, Ltd.,

stock by exchange for bonds of March Gold, Ltd. These shares, 25,375, of the par value of $1 per share, were received by plaintiff Kinkel on account of the indebtedness to him of $10,150, as aforesaid. On October 2, 1934, he purchased 8,750 shares at .40 per share. He also received by assignment for services from other bondholders in Marbuan shares aggregating 73,647. Certificates in evidence Nos. 9, 10, 11, 68, and 74 show the shares held by Kinkel in Marbuan.

During the years 1930–1933, inclusive, the plaintiff Kinkel did not report as taxable income the amount he received from "March Gold" and "Ltd." on the bonds received as security for indebtedness and the stock he received by assignment for services.

In 1930–1932 Kinkel was attorney for, and one of the syndicate managers of, a mining venture called Ankerite Gold Mines Syndicate. During that time he received 13,000 shares for his services and bought 4,200 shares.

On October 20, 1932, the Buffalo Ankerite Gold Mines, Ltd., was organized in the Dominion of Canada, and the property of the Ankerite Gold Mines Syndicate was conveyed to this corporation. The stock was issued to the syndicate members and in that exchange Kinkel received 110,080 shares of the corporate stock in exchange for 17,200 units acquired in Ankerite Gold Mines Syndicate at dates commencing from December 8, 1930, to October 20, 1932. In 1932, he sold 5,620 shares and in 1933, 9,650.

In 1934, he purchased at least 15,746 shares of Buffalo Ankerite Gold Mines, Ltd., for his own account.

On March 15, 1935, the plaintiffs herein filed an individual income tax return for the calendar year 1934. They reported a capital gain of $28,927.45. This was made up, save an item of $1,836.52 designated Jacob Betz, of sales of 14,016 shares of Buffalo Ankerite for $27,083.52 received without cost to the taxpayer; 7,332 shares of Buffalo Ankerite for $19,646.34 received without cost to the taxpayer, and 26,437 shares of Marbuan Gold Mines, Ltd., at a cost of .565 per share for .592 and including a loss of $1,218.16 from the sale of 17,050 shares

of Buffalo Ankerite Gold Mines, Ltd., and a loss from the sale of other stocks of $421.46. The plaintiffs paid $5,685.46 as the amount of the tax disclosed in their return. Anticipating the action of the Commissioner of Internal Revenue, the plaintiff on September 28, 1937, paid the Collector under protest the sum of $10,188.30, and the Collector credited $8,843.01, the deficiency tax assessed by him on October 25, 1937, of which $425.25 was interest. On September 26, 1939, the plaintiffs filed a claim for refund. On February 25, 1941, this was disallowed. This action was commenced in 1943. The taxpayers reported in their return a surtax net income of $36,222.29 and a surtax of $4,266.68; a balance of $35,469.75 subject to normal tax and a normal tax at 4% of $1,418.78, making a total of $5,685.46. The Commissioner found a surtax net income of $63,496.44, with a surtax of $12,018.72 and a balance of $62,743.86 subject to normal tax, at 4%, of $2,509.75, making a total of $14,528.47. Deducting the $5,685.46 paid, the Commissioner found an additional tax of $8,843.01. The Commissioner increased the item of capital gain from reported of $28,927.45 to $54,871.88.

As hereinbefore noted, Kinkel received from bonds of the operating company as security for the notes given him for services in 1930 to 1932 in the amount of $10,150. It is the contention of the government that the 25,375 shares of Marbuan stock received by Kinkel as a bondholder of March Gold were acquired by him on the date the mortgaged property of "Ltd." was sold in the foreclosure proceedings on July 26, 1933.

One contention as made by plaintiffs in the refund claim is that the date of the acquisition of this Marbuan stock was the date plaintiffs received the promissory notes for Kinkel's services—October, 1931, and November, 1932. This would only be so provided it was agreed that the notes should constitute payment for the service. Evidently there was no such agreement, because the plaintiffs had bonds as security. See: Anthony P. Miller, Inc., v. Commissioner, 3 Cir., 164 F.2d 268, 4 A.L.R.2d 1219.

■ Another position taken by the taxpayers has been that the stock was acquired on the dates Kinkel received the bonds. Since he had these bonds as security, he acquired no title or conrtol over the bonds, and hence there could have been no acquisition.

The claim has also been made that the Marbuan stock bonds were acquired on the dates when sold, on the theory that payment was then received for services performed. It is pointed out by the defendant that, if that is the correct date of acquisition, the gain from the stock would be taxable as current income and not as capital gain, and hence the taxpayer could not complain.

■ The determination of the Commissioner as to the date of the acquisition of this stock is correct, because it was then that Kinkel first obtained full control over these bonds. This date was July 26, 1933. As the Court said in Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179, 62 S.Ct. 540, 543, 86 L.Ed. 775: "We conclude, however, that it is immaterial that the transfer shifted the ownership of the equity in the property from the stockholders to the creditors of the old corporation. Plainly the old continuity of interest was broken. Technically that did not occur in this proceeding until the judicial sale took place. For practical purposes, however, it took place not later than the time when the creditors took steps to enforce their demands against their insolvent debtor. In this case, that was the date of the institution of bankruptcy proceedings. From that time on they had effective command over the disposition of the property."

■ The plaintiffs would not be in a better position if the acquisition were said to have been on August 6, 1933, the date when there was an actual delivery of the Marbuan stock to Kinkel in payment for his services. The plaintiffs also have claimed that the date of acquisition of the Marbuan stock is to be determined in accord with the I.R.C. § 117(h), 26 U.S.C.A. § 117(h). This is not so because plaintiffs held the bonds as security only. It is true in the foreclosure they obtained full title to new bonds. Admitting the effect of the procedure

through foreclosure was to perfect a reorganization, it is believed this has no significance here. There is nothing in the record to show that when the foreclosure was commenced and reorganization was contemplated the bank foreclosed, because the obligations of the company had not been met. Among the cases cited by the plaintiffs upon this point, there was none in which there was an exchange of old bonds under a reorganization. A complete answer is that plaintiffs, prior to the sale, had only a contingent interest in the bonds.

Section 112(k) of the Revenue Act of 1932, 26 U.S.C.A.Int.Rev.Acts, page 514, provides that, in determining the extent of gain on any exchange described or referred to in certain subsections of 112, "a foreign corporation shall not be considered as a corporation unless, prior to such exchange or distribution, it has been established to the satisfaction of the Commissioner that such exchange or distribution is not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes." The purpose of this Statute is obvious.

It is urged by the plaintiffs that this section has no application, because it was here an exchange between foreign corporations. In the view of the Court, it seems unnecessary to determine this question.

While it is true March Gold, Inc., was not a party to the foreclosure, it owned practically all of the stock of "Limited", and when "Limited" became bankrupt March Gold then had no assets as it was merely a holding company for "Ltd." See: Art. 581, Treas.Reg. 77. This section provides that whether an exchange is in pursuance of a plan, having the purpose to avoid the income taxes, is a question to be determined from the facts and circumstances in each case. The Regulation required that where the taxpayer desires to show the exchange is not in pursuance of such a plan, he shall make a statement under oath of the facts relating to it. No such oath was made here; nor has there been any proof of facts and circumstances to show that the exchange was not in pursuance of a plan to avoid Federal income taxes. See: Palm Springs Holding Corp. v. Commissioner,

315 U.S. 185, 62 S.Ct. 544, 86 L.Ed. 785; Bondholders Committee v. Commissioner, 315 U.S. 189, 62 S.Ct. 537, 86 L.Ed. 784; and Helvering v. Alabama Asphaltic Limestone Co., supra.

■ The gain on the sale of Buffalo Ankerite stock was determined in the same method as that with reference to the Marbuan stock. The taxpayers under their method of accounting take the amount received for the total number of shares sold during the year and subtract the cost of the shares purchased during the year. In the method employed by the Commissioner, where the shares of stock are indentifiable, for tax purposes, each sale is considered separately. As was said in Skinner v. Eaton, 2 Cir., 45 F.2d 568, 570, certiorari denied 283 U.S. 837, 51 S.Ct. 486, 75 L.Ed. 1449: "The Revenue Act does not permit merging the cost of stock acquired at various prices and over a period of years. Shares of stock are identifiable, and, for income tax purposes, they are regarded as specific properties." See also: Commissioner of Int. Rev. v. Von Gunten, 6 Cir., 76 F.2d 670; and Kraus v. Commissioner of Int. Rev., 2 Cir., 88 F.2d 616.

■ Section 131(a) of the Revenue Act, 26 U.S.C.A.Int.Rev.Acts, page 530, provides that the taxpayer may have the benefit of taxes paid in foreign countries if he signifies in his return his desire to have this benefit. This right is given to a citizen or a domestic corporation. It is the taxpayers' contention that they made no election in their return to take either the credit or the deduction, but that the Commissioner on auditing the return decided that the taxpayers must take the deduction and could not take advantage of the "Foreign Tax Credit." Taxpayers claim an election bements made after their claim for credit. Taxpayers in their 1934 income tax return cause the audit resulted in further assess-reported $13,237.57 as dividends on stock of foreign corporations. The Commissioner found $12,857.57 as a net total received from such dividends. He determined that the gross dividends received were $13,534.-28 and that tax in amount of $676.71 had been paid in respect thereof. This change involved in no way the question of an election by the taxpayers.

It is the taxpayers' claim that the amendment of Section 131(a) of the Internal Revenue Code by Section 158 of the Revenue Act of 1942, Chapter 619, 56 Stat. 798, 26 U.S.C.A. § 131(a), indicates that Congress originally intended that an election could be made at any time prior to the limitation period for filing refund claims, in the original Act of 1932. It is pointed out by the defendant that the change in 1942 was not made retroactive nor could it have been so made. Taxpayers never filed an amended return. There is no proof that the taxpayers did not know that they were entitled to a credit when the return was filed. Concerned with large business interests, the Court might presume they had knowledge of the right to a tax allowance.

In certain cases it has been held that where the taxpayer had no knowledge that the foreign taxes would be laid or where there were other peculiar facts or circumstances, not comparable here, a re-determination has been allowed.

In W. K. Buckley, Inc., v. Commissioner of Internal Revenue, 2 Cir., 158 F.2d 158, 162, cited by the taxpayers, does not present a comparable case. The court there said: "Here, in the circumstances, the failure to comport with the regulation was the omission of a mere formality. * * *

"Section 131(a) was intended, we think, to prevent a taxpayer, fully cognizant of the facts when making his return, from subsequently changing its position, but not to hold a taxpayer to a choice made when unaware that its choice had practical consequences."

In Connor v. United States, D.C., 19 F. Supp. 97, 101, it appears that the taxpayer had no knowledge that a tax would be taxed by the foreign country. In that case the court said: "The law should not be so interpreted as to require the impossible." There the court said: "At that time (time of filing return) the petitioner had no reason to believe that a tax thereon would be assessed by the Canadian government as no such tax had been theretofore assessed."

48

In Gentsch v. Goodyear Tire & Rubber Co., 6 Cir., 151 F.2d 997, the taxpayer originally deducted foreign taxes as expenses, and this showed a substantial net loss. The Internal Revenue disallowed the claimed losses so that substantial tax liability was indicated. The Court held that the taxpayer is entitled to file a timely amended return signifying desire to use the foreign tax item as a credit against tax liability. In the instant case, as stated, there was no amended return made, and the claim for deduction first appears in the claim for refund.

In Shire v. McGowan, 24 A.F.T.R. 1256, and in Marcy v. McGowan, 27 A.F.T.R. 1107, decided by this Court, it was held that the claim must be made in the return.

The claim for the refund for the foreign tax credit must be denied.

The complaint alleges a taxable gain of $4,788.73 on the sale of 25,850 shares of stock held jointly by Kinkel and one Betz. The Commissioner held that there was a taxable gain of $6,236.12. Plaintiffs assert that the profits of the joint venture between the two having been determined in 1934, the capital gain as reported in the tax return was proper.

■ There had been no return of capital invested by either party to the transaction. It is admitted that the Kinkel-Betz transaction is not "specifically mentioned" in plaintiffs' claim for refund, but the taxpayers, in referring to capital gains, asserted that the Treasury Department auditing return erroneously disallowed taxpayers' method of accounting, and that, therefore, the determination of the Commissioner is incorrect and this correction has been made. It is believed that the Commissioner's method of determination is correct. It seems to the Court that the timely demand for a refund limits plaintiffs' recovery or credit in a suit on the refund. Ronald Press Co. v. Shea, 2 Cir., 114 F.2d 453; Real Est. Title Co. v. United States, 309 U.S. 13, 60 S.Ct. 371, 84 L.Ed. 542; United States v. Felt & Tarrant Mfg. Co., 283 U.S. 269, 51 S.Ct. 376, 75 L.Ed. 1025.

Findings may be submitted to accord with the foregoing, and judgment entered against the plaintiffs, with costs.