KINKEL et al. v. McGOWAN, Collector of Internal Revenue.

No. 58, Docket 21761.

United States Court of Appeals Second Circuit.

Argued March 7, 1951.

Decided April 23, 1951.

Daniel G. Yorkey, of Buffalo, N. Y. (Edward G. Kinkel and Albert R. Mugel, both of Buffalo, N. Y., on the brief), for plaintiffs-appellants.

Melva M. Graney, Sp. Asst. to Atty. Gen. (Theron Lamar Caudle, Asst. Atty. Gen., Ellis N. Slack, Sp. Asst. to Atty. Gen., and George L. Grobe, U. S. Atty., and R. Norman Kirchgraber, Asst. U. S. Atty., both of Buffalo, N. Y., on the brief), for defendant-appellee.

Before L. HAND, AUGUSTUS N. HAND and CLARK, Circuit Judges.

CLARK, Circuit Judge.

Plaintiffs Edward G. and Caroline G. Kinkel sued the Collector of Internal Revenue for partial refund of federal income taxes paid for the year 1934. On stipulated facts the district court dismissed their complaint on its merits and they have appealed on three points. We think the judgment must be affirmed.

The first point involves the correctness of a deficiency assessed against the taxpayers by the Commissioner of Internal Revenue based on an increase in the capital gain reported. The facts are as follows:

During 1930, 1931, and 1932, Edward Kinkel[1] was employed as attorney by March Gold, Inc., a Delaware corporation, and also by its 93 per cent owned Canadian subsidiary, March Gold, Ltd., which operated a gold mine. For services rendered from August, 1930, to November 14, 1932, he received promissory notes for $10,150. As security for these notes he was also given $10,150 worth of Limited's $150,000 issue of 7% first closed mortgage sinking fund gold bonds payable July 1, 1936. Some of these were delivered contemporaneously with the notes thus secured and some were not. In July, 1932, Limited suspended mining and milling operations. Then in April, 1933, Kinkel and other

---

1. Mrs. Kinkel, a party because she and her husband filed a joint return, is not involved in the transactions discussed.

creditors delivered to the Royal Bank of Canada $148,500 of these bonds as collateral security for a $25,000 overdue obligation owed the Bank by Limited. The Bank foreclosed on May 20, 1933, because Limited was in default on both the bonds and the sinking fund. The foreclosure decree, which was entered July 26, 1933, concededly wiped out Kinkel's notes. Kinkel and other bondholders then put up the $25,000 owed to the Bank and an additional $12,000, which had been assessed against Limited by the Ontario Workmen's Compensation Commission, and took over Limited's property as purchasers on foreclosure. Later a new Canadian corporation, Marbuan Gold Mines, was organized to operate Limited's old properties. Marbuan issued stock and warrants to Limited's bond-and-stockholders, respectively. Thus Kinkel received 25,375 shares of Marbuan's stock by the first means, and bought 8,750 more under warrants. In 1934 he also bought or received other shares which are not involved here, but sold 13,512 shares before July 26, 1934, and 2,739 shares thereafter. The issue is as to the length of time the shares sold had been held.

Sec. 117(a) of the Revenue Act of 1934, 26 U.S.C.A. Int.Rev. Acts, page 707, then in force, provided that "only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net income: 100 per centum if the capital asset has been held for not more than 1 year; 80 percentum if the capital asset has been held for more than 1 year but not for more than 2 years; 60 per centum if the capital asset has been held for more than 2 years but not for more than 5 years." Taking July 26, 1933, as the date of acquisition of the stock and applying the rule of "first in, first out," the Commissioner found the gain on the first block sold taxable 100 per cent and that on the second block taxable 80 per cent. But the taxpayers attack this conclusion by carrying the date of acquisition back to an earlier period because, as they urge, they are entitled to tack on, to the holding period of the stock itself, the period—or part of the period—during which they held the bonds later *exchanged* for the stock. So they argue that they "owned" the bonds when received on or before November 14, 1932, or at least when the notes became worthless prior to the foreclosure, probably also in 1932 when Limited stopped its mining and milling operations.

■■ We cannot accept the argument thus made for an earlier date of acquisition of the property. For as this court has ruled, the word "'Held' in § 117 of the Act of 1934, 26 U.S.C.A. Int.Rev. Acts, page 707, means the same as 'acquired and held' (McFeely v. Commissioner, 296 U.S. 102, 107, 56 S.Ct. 54, 80 L.Ed. 83, 101 A.L.R. 304) and one cannot be said to have 'acquired' property merely because one has given his debtor the power to use it in satisfaction of an accord." Shattuck v. Helvering, 2 Cir., 119 F.2d 902, 903. So the question is when taxpayers acquired the stock, and the case of Helvering v. San Joaquin Fruit & Investment Co., 297 U.S. 496, 499, 56 S.Ct. 569, 570, 80 L.Ed. 824, is controlling. There the Supreme Court held that optioned property was "acquired" by the optionee when he *exercised* the option, not when he merely procured it, and went on to say: "The word 'acquired' is not a term of art in the law of property but one in common use. The plain import of the word is 'obtained as one's own.'" Similarly, the taxpayers here had the option to sue on the notes, to foreclose, or not to do either, as they chose. We cannot say that they had obtained the bonds as their own before completion of the foreclosure. Hence they did not "hold" the stock, for purposes of § 117, until they acquired it; and the Commissioner was right in fixing the date of acquisition as July 26, 1933, the date of foreclosure.

The Commissioner also presented an additional ground of objection to the carrying back of the date of acquisition of the property as claimed by taxpayers. He asserts that taxpayers' argument of receiving the Marbuan stock in a tax-free exchange is based upon the contention that there was a reorganization of a corporation within the meaning of § 112(i)(1)(A) of the 1932 Act, 26 U.S.C.A. Int.

Rev. Acts, page 513, because, by reason of the action of the bondholders, the properties of March Gold, Ltd., were acquired by Marbuan. Under subsec. (k), however, the reorganization of a foreign corporation shall not be recognized unless prior to the exchange or distribution of securities involved "it has been established to the satisfaction of the Commissioner that such exchange or distribution is not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes." Art. 581 of U. S. Treas. Reg. 77, promulgated under the Act of 1932, implements this statute by requiring the taxpayer who desires to take advantage of the section to furnish a statement under oath of the facts relating to the plan to the Commissioner at the time of the reorganization. No such steps were taken in this case. Plaintiffs argue that the intent of the statutory provision is to prevent transfer from a domestic to a foreign corporation, and not transfers between wholly foreign corporations. But the statute makes no such distinction in terms, and there is nothing to indicate any such limited intent upon the part of the legislators. The Committee Report cited to us, Sen.Rep. No. 665, 72d Cong., 1st Sess., 1939–1 Cum.Bull., Part 2, 515, cf. also 471, appears merely to limit its specific illustrations to those of transfers to a foreign corporation, and not to suggest that the more broadly stated statute was thus limited. While the purpose of the statute seems obvious, we need not pursue the matter further in view of the conclusion we have reached sustaining the Commissioner's main ground for the deficiency assessment.

■ Taxpayers' second point is that under § 131 of the Revenue Act of 1934, 26 U.S.C.A. Int.Rev. Acts, page 713, they are entitled to a foreign tax credit for Canadian taxes paid for the year 1934. But the section specifies that the credit may be allowed "If the taxpayer signifies in his return his desire to have the benefits of this section"; otherwise the payments, if claimed at all, may be treated only as a deduction from gross income. Here no claim whatsoever was made in the tax return filed in March, 1935, although a substantial tax was then shown as due. The first mention of the claim for credit is in the claim for refund filed on September 26, 1939, when Kinkel paid the assessed deficiency under protest. While some judicial modifications have been made in the formal requirement of the statute, W. K. Buckley, Inc., v. C. I. R., 2 Cir., 158 F.2d 158; Gentsch v. Goodyear Tire & Rubber Co., 6 Cir., 151 F.2d 997, 1001, they are inapposite to this ease. In the Buckley case the taxpayer did not need to make an election on his original return because he thought he had no tax to pay. But when it was determined that this was wrong because he had erroneously, though in good faith, failed to report foreign earnings which could not be removed from the country of source, he was permitted on equitable principles to make his first election at the latter time. The court relied upon the Gentsch case, which was similar. There the Goodyear Company had filed a consolidated return for 1932, reporting a consolidated net loss. The Commissioner determined that there actually was a consolidated net income. Consequently Goodyear rewrote its return to claim a credit for the amount of foreign taxes taken as a deduction on the earlier return. As the court said: "The elements from which selection must be made, and which alone give it meaning, come into existence only when there is disclosed or the Commissioner has determined a tax liability. Then, for the first time, is the taxpayer confronted with the need for determining whether to deduct his foreign taxes from gross income or to claim them as a credit on his tax liability." In our present case the taxpayers had a tax to pay, as shown by their original return, against which they should have taken the deduction, had they wished to claim it. Hence the case is indisputably one where at the time when the original return was filed, a tax liability had "come into existence" under the principle of the Gentsch and Buckley decisions.

■ The taxpayers' third point is likewise devoid of merit. In 1934, Kinkel, who was reporting on a calendar year basis, had made gains in the sale of shares

738

in a joint account he was running with one Betz. These he reported in his return, although now he insists that until the whole account was closed out, which happened sometime after the expiration of the year, no tax should have been assessed. No apposite authority is asserted for this proposition, which seems to us clearly unsupportable. Defendant also points out that the claim for refund was inadequate to supply a base for this claim, since it made no specific reference to this transaction. Since we dispose of the claim on the merits, we need not go to this point of tax pleading.

Judgment affirmed.