CONSTRUCTION AGGREGATES CORPORATION, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 71 C 1043.

United States District Court,
N. D. Illinois, E. D.
July 25, 1972.

William A. Cromartie, Dennis B. Black, Hopkins, Sutter, Owen, Mulroy & Davis, Chicago, Ill., for plaintiff.

James R. Thompson, U. S. Atty., Scott P. Crampton, Asst. Atty. Gen., David A. Wilson, Jr., and Michael J. von Mandel, Attys., Department of Justice, for defendant.

## MEMORANDUM OPINION

DECKER, District Judge.

This is a tax refund case brought by Construction Aggregates Corporation (hereinafter "CAC") pursuant to the provisions of 28 U.S.C. § 1346(a)(1). Both CAC and the Government have moved for summary judgment and have stipulated to the facts upon which the motions will be decided. Those facts are as follows.

Plaintiff CAC is a Delaware corporation which, during its tax year ending March 31, 1960, was owned by five or fewer individuals. Generally, it conducted world-wide engineering, contracting and earth moving operations by itself and through various foreign subsidiaries. One of those subsidiaries was Inversiones del Sur C.A. (hereinafter "IDS"), which was a wholly owned Venezuelan subsidiary operating on a fiscal year ending November 30th. IDS in turn owned all of the stock of Marine Engineering Company S.A. (hereinafter "Marine"), a Panamanian corporation operating on a fiscal year ending March 31st.

In 1955 Marine sold two ocean-going vessels for $800,000 in cash, and thereby realized earnings and profits of approximately $500,000. This cash was subsequently invested in long term 5% debentures yielding substantial annual interest income. Since its only income consisted of interest, Marine was, during its fiscal years ending March 31, 1956, 1957, 1958 and 1959, a foreign personal holding company (hereinafter "FPHC") as that term is defined in § 552 of the Internal Revenue Code (hereinafter "I. R.C."). Consequently, its undistributed income, since it was "foreign personal holding company" income (hereinafter "FPHC income"), in those years, was attributable to IDS as a dividend pursuant to the provisions of § 551 I.R.C.

By virtue of this attribution of FPHC income to IDS, it also was considered to be a FPHC, § 552 I.R.C., in its 1957 and 1958 tax years. Similarly, its FPHC income was attributable to CAC under § 551 I.R.C. in CAC's corresponding tax years.

On November 30, 1959, in pursuance to a plan of complete liquidation which satisfied all of the requirements of §

332 I.R.C.,[1] Marine distributed all of its assets to IDS. The amount of gain which IDS realized was $543,756. Further, in its tax year ending November 30, 1959, IDS had income from operations in the amount of $116,510.22, rental income of $18,955.23 and interest of $5,011.34. In addition, during that year, Marine accrued $66,667.67 of interest income. Thus, without taking into account any of the proceeds from the Marine liquidation, less than 50% of IDS's gross income in its fiscal year ending November 30, 1959, constituted FPHC income, and, therefore, aside from the effect of the recognition of any gain upon liquidation, IDS would not have been considered a FPHC in that tax year.

However, even though it is stipulated that the liquidation qualified for the non-recognition of gain under § 332, the

1. § 332. Complete liquidations of subsidiaries

(a) General rule.—No gain or loss shall be recognized on the receipt by a corporation of property distributed in complete liquidation of another corporation.

(b) Liquidations to which section applies.—For purposes of subsection (a), a distribution shall be considered to be in complete liquidation only if—

(1) the corporation receiving such property was, on the date of the adoption of the plan of liquidation, and has continued to be at all times until the receipt of the property, the owner of stock (in such other corporation) possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and the owner of at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends); and either

(2) the distribution is by such other corporation in complete cancellation or redemption of all its stock, and the transfer of all the property occurs within the taxable year; in such case the adoption by the shareholders of the resolution under which is authorized the distribution of all the assets of such corporation in complete cancellation or redemption of all its stock shall be considered an adoption of a plan of liquidation, even though no time for the completion of the transfer of the property is specified in such resolution; or

(3) such distribution is one of a series of distributions by such other corporation in complete cancellation or redemption of all its stock in accordance with a plan of liquidation under which the transfer of all the property under the liquidation is to be completed within 3 years from the close of the taxable year during which is made the first of the series of distributions under the plan, except that if such transfer is not completed within such period, or if the taxpayer does not continue qualified under paragraph (1) until the completion of such transfer, no distribution under the plan shall be considered a distribution in complete liquidation.

If such transfer of all the property does not occur within the taxable year, the Secretary or his delegate may require of the taxpayer such bond, or waiver of the statute of limitations on assessment and collection, or both, as he may deem necessary to insure, if the transfer of the property is not completed within such 3-year period, or if the taxpayer does not continue qualified under paragraph (1) until the completion of such transfer, the assessment and collection of all income taxes then imposed by law for such taxable year or subsequent taxable years, to the extent attributable to property so received. A distribution otherwise constituting a distribution in complete liquidation within the meaning of this subsection shall not be considered as not constituting such a distribution merely because it does not constitute a distribution or liquidation within the meaning of the corporate law under which the distribution is made; and for purposes of this subsection a transfer of property of such other corporation to the taxpayer shall not be considered as not constituting a distribution (or one of a series of distributions) in complete cancellation or redemption of all the stock of such other corporation, merely because the carrying out of the plan involves (A) the transfer under the plan to the taxpayer by such other corporation of property, not attributable to shares owned by the taxpayer, on an exchange described in section 361, and (B) the complete cancellation or redemption under the plan, as a result of exchanges described in section 354, of the shares not owned by the taxpayer.

.    .    .    .    .

Commissioner of Internal Revenue determined that because plaintiff did not seek advance clearance of the liquidation transaction, which he felt was required under § 367 I.R.C.,[2] then (a) the tax-free exchange provisions of § 332 did not apply to the liquidation, (b) IDS recognized a gain of $543,756 on the liquidation, (c) the gain recognized constituted FPHC income (§§ 543 and 553 I.R.C.) which exceeded 50% of the gross income of IDS in its 1959 fiscal year. The Commissioner concluded, therefore, that IDS was a FPHC whose FPHC income was attributable to CAC as a dividend in the amount of $539,716.36 in CAC's taxable year ending March 31, 1960.

Because of this determination by the Commissioner, he proposed a deficiency in federal income taxes against plaintiff in the amount of $278,313.95 for plaintiff's taxable year ended March 31, 1960. CAC, having waived the restrictions upon assessment of the income tax deficiency in question pursuant to § 6213(d) I.R.C., paid the proposed deficiency and $145,775.51 in assessed interest.

Subsequently, on April 21, 1970, plaintiff filed a "Claim for Refund" (Form 841) for the aforementioned amounts. That claim was received by the District Director of Internal Revenue, Chicago, Illinois, on April 23, 1970. Since the District Director made no decision within six months after receipt of the claim, plaintiff commenced this action under the authority of §§ 7422(a) and 6532(a) I.R.C.

There are essentially two distinct issues presented in this lawsuit. The first is whether a 1964 revenue ruling, holding that § 367 was applicable to the liquidation of a "second-tier" foreign subsidiary into a "first-tier" foreign subsidiary[3] "where gain would otherwise be taxable only in the form of Subpart F income",[4] should be retroactively applied to the transaction involved in the present case. See Rev.Rul. 64–157, 1964–1 C.B. 139. The second issue is whether, notwithstanding the resolution of the foregoing question, the transaction actually generated sufficient foreign personal holding company income to give rise to CAC's alleged tax liability.

I.

The Government has stipulated that if plaintiff (hereinafter "the taxpayer") had complied with the requirement of obtaining an advance ruling under § 367, it would not have been liable for the taxes in question by virtue of § 332. The taxpayer argues that a § 367 ruling is not required when a transaction involves two foreign corporations with no direct business connection with the United States. In answer, the Government relies on Rev.Rul. 64–157, *supra*, and argues that it should be retroactively applied to the transaction in question in the case at bar. It is the taxpayer's answer to the latter argument that frames the first of the two major issues of this case.

2. § 367 I.R.C., as in effect at the time in question, provided:

"In determining the extent to which gain shall be recognized in the case of any of the exchanges described in section 332, 351, 354, 355, 356, or 361, a foreign corporation shall not be considered as a corporation unless, before such exchange, it has been established to the satisfaction of the Secretary or his delegate that such exchange is not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes. For purposes of this section, any distribution described in section 355 (or so much of section 356 as relates to section 355) shall be treated as an exchange whether or not it is an exchange."

3. A "second-tier" foreign subsidiary, for purposes of the present discussion, is a wholly-owned subsidiary of a foreign corporation which is in turn wholly-owned by a United States corporation.

4. Subpart F was added to the I.R.C. in 1962, and, in substance, provides for the taxation of U. S. shareholders for income, whether distributed or not, from "controlled foreign corporations". See 26 U.S.C. §§ 951–964.

■ Although the taxpayer does not, nor could it, dispute the authority of the Commissioner of Internal Revenue to give retroactive application to revenue rulings, 26 U.S.C. § 7805(b); Dixon v. United States, 381 U.S. 68, 85 S.Ct. 1301, 14 L.Ed.2d 223 (1965), it argues that Rev.Rul. 64–157 applies only to cases involving potential taxation to a U.S. taxpayer under Subpart F, I.R.C. Hence, if this argument were accepted, Rev.Rul. 64–157 would only be retroactive to 1962 (the year the Subpart F provisions became effective) and would only apply to cases specifically involving Subpart F tax liability. The Government asserts that the foregoing ruling should not be given such a restrictive interpretation and clearly applies to the 1959 transaction in question in the present case.

■ Viewed in this narrow context, the issue presented raises two further questions. First, what was the "law" or "custom" in 1959 with respect to the application of § 367 to FPHC income generating transactions, assuming Rev.Rul. 64–157 should not be retroactively applied? Second, is a distinction between the FPHC provisions and the Subpart F provisions appropriate for purposes of applying § 367, thereby warranting the limitation of Rev.Rul. 64–157 to post-1962 (Subpart F) transactions?

The first question is whether, even in 1959, the taxpayer acted prudently in failing to secure an advance ruling, pursuant to § 367, when Marine was liquidated into IDS. The taxpayer argues that the Government's position "flatly contradicts the universal understanding [as it was in 1959] . . . that § 367 had no application to a liquidation such as that of Marine into IDS." As authority, the taxpayer relies on five published comments on the application of § 367. In addition, the taxpayer suggests an interpretation of Rev.Rul. 64–157 and a companion ruling, Rev.Rul. 64–158, 1964–1 C.B. 140, that comports with its theory of the case.

While the Government correctly states that the views of commentators and legal scholars do not have the force of law or legal precedent, it somewhat cavalierly dismisses the taxpayer's authorities without considering whether they shed some light on the problem at hand. However, close analysis of the "authorities" cited by the taxpayer not only challenges the force of its arguments, but also serves as a useful guide for the resolution of the problems presented by the case.[5]

---

5. Three of the taxpayer's authorities require little discussion. First, the taxpayer cites an article by Lamp in 21 J.Tax at 240. The quotation taken from the article clearly states that a § 367 ruling would not apply in a situation such as the one presented here. However, the *only* authority cited by the author is Rev.Rul. 64–157, the interpretation of which is highly questionable. Second, an article by Rapp in 13 J.Tax at 344, is cited with reference to the fact that liquidation of second-tier foreign subsidiaries into first-tier foreign subsidiaries is conspicuously omitted from a list of transactions suggested by the author to require § 367 rulings. Notwithstanding, there is no suggestion in the article that the list was, or was intended to be, an all-inclusive list or that those actually included covered all special circumstances, such as the presence of FPHC income. Finally, an article by Phelps in 19 N.Y.U.Instit.Fed.

Tax at 905 is quoted as follows: "A foreign subsidiary of a U. S. corporation may create its own foreign subsidiaries and liquidate them at will, without regard to § 367. The U. S. income tax authorities have no jurisdiction in such transactions unless they can first successfully disregard the separate corporate entity of the top subsidiary." It is important to note, however, that the article was published before the advent of the Subpart F provisions, cites no authority for the proposition, and ignores the possibility of U. S. tax authorities having "jurisdiction" where FPHC income is earned by the first-tier subsidiary. In short, while all three articles suggest that § 367 will not generally be applicable to reorganizations of solely foreign corporations, none of them makes any attempt to focus on the particular problem of this case: namely, whether the creation of FPHC income involves

Only two of the commentators cited give any consideration to the specific problem raised in this case, and it is clear from what they have to say that any "understanding" as to the scope of § 367 prior to the revenue rulings in question was far from "universal". Indeed, the peril of taking any firm position as to the applicability of § 367 is amply demonstrated in the very first sentence of the article by Robert McDonald entitled, "Section 367—A Modern Day Janus", cited by the taxpayer:

"Section 367 of the Internal Revenue Code, a part of the federal tax law since 1932, has through the years been shrouded in mystery, its true shape and form having been fashioned largely by unpublished rulings, the half truths of repeated hearsay, and the subjective interpretations of those charged by the Commissioner with unraveling its ambiguous subtleties." 64 Columbia Law Review 1012.

Moreover, it is instructive to compare McDonald's extensive discussion of the implications of § 367 and Rev.Rul. 64–157 and 64–158, *supra*, which was published immediately after the release of the foregoing rulings, with an article by Stanford Ross, also cited by the taxpayer, which was written before and without knowledge of those rulings. 22 N.Y.U. Instit. Fed. Tax 761. Mr. Ross apparently reached the conclusion; illustrated by example hypotheticals, that the liquidation of one foreign subsidiary into another would not require a § 367 ruling because there would be no "immediate United States tax", and, therefore, no § 367 "gain" could result.[6] While the problem of potential FPHC income in the context of "gain" under § 367 is not directly considered in the Ross article, the author suggests that the analysis would be the same as if the problem were considered in light of the Subpart F provisions.[7] Ross then makes such an analysis and concludes that § 367 "would not seem relevant", even though the transaction might give rise to Subpart F income. 22 N.Y.U. Instit. Fed. Tax at 777. The invalidity of Mr. Ross' conclusion, at least from the point of view of the Internal Revenue Service, is clearly demonstrated by Rev.Rul. 64–157.

The McDonald article is the only authority cited by either party that gives intensive consideration to the problem of FPHC income in the context of § 367 and the meaning of Rev.Rul. 64–157 and 64–158. He states that the general practice, even before the Subpart F provisions were added to the I.R.C., was that § 367 rulings were issued in FPHC income cases and suggests that the Commissioner of Internal Revenue interpreted "gain" (in § 367) broadly enough to encompass transactions generating imputed income that might not have immediate U.S. tax consequences, but would at least involve taxation or an accounting by a U.S. taxpayer by the end of a given tax year.[8]

sufficiently immediate U. S. tax consequences to warrant the application of § 367 and thereby require an advance ruling.

6. Although Mr. Ross is a former Treasury Department official, it should be pointed out that at the very outset, in his first footnote, he states that, "The views expressed are personal."

7. Immediately prior to his discussion of the possible implications of Subpart F with respect to § 367 rulings in the context of wholly foreign corporate reorganizations he states in a footnote as follows: "The issue of immediate gains by reason of imputed income, discussed below in the context of the controlled foreign corporation provisions [Subpart F], might have been raised before the Revenue Act of 1962 in the context of the foreign personal holding company provisions. There is no evidence that it was, however, so the issue is dealt with in the controlled foreign corporation context where it seems more likely to arise."

8. "If the effect approach is concerned only with immediate taxability, as Ruling 64–158 suggests, it seems plainly inconsistent with the policy adopted by the Service in the past . . . the Commissioner has issued private rulings under Section 367 both in cases where the recognition of gain to a foreign corporation might create foreign personal holding company income, and in cases

Kinkel v. McGowan, 188 F.2d 734 (2d Cir. 1951), supports the foregoing conclusion. In a tax refund case involving foreign subsidiary corporations, the court had occasion to comment on an argument by the taxpayer similar to the taxpayer's argument in the present case.

"Under subsec. (k) [now § 367], however, the reorganization of a foreign corporation, shall not be recognized unless prior to the exchange or distribution of securities involved 'it has been established to the satisfaction of the Commissioner that such exchange or distribution is not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes.' Art. 581 of U.S.Treas. Reg. 77, promulgated under the Act of 1932, implements this statute by requiring the taxpayer who desires to take advantage of the section to furnish a statement under oath of the facts relating to the plan to the Commissioner at the time of the reorganization. No such steps were taken in this case. Plaintiffs argue that the intent of the statutory provision is to prevent transfer from a domestic to a foreign corporation, and not transfers between wholly foreign corporations. But the statute makes no such distinction in terms, and there is nothing to indicate any such limited intent upon the part of the legislators." 188 F.2d at 737.

Moreover, apart from what any commentator may have written, it is apparent that other taxpayers did not ignore § 367 requirements and secured rulings in similar cases. See Rev.Rul. 57–465, 1957–2 C.B. 250. *Cf.* , Texas-Canadian Oil Corporation, Ltd. v. Commissioner, 44 B.T.A. 913 (1941).

The taxpayer also argues that Rev. Rul. 64–158 changes the scope of § 367 by *expanding* its application. Such an interpretation is clearly inconsistent with what the ruling actually held and with the interpretation given to it by the only authority the taxpayer cites on the point.[9]

Rev.Rul. 64–158 stated that earnings and profits and basis will carry over in a transfer of assets between two *foreign* corporations just as they would in a similar transaction between two domestic corporations which qualified as a tax-free reorganization. § 367 is not mentioned and, by implication, not applicable in that situation. The approach adopted is obviously an "immediate tax effect" approach, i. e., only an immediate tax effect will trigger § 367. However, by its terms Rev.Rul. 64–158 applied only to transactions after September 15, 1960, so that the transaction in the present case could not, in any event, be governed by that ruling.

The final paragraph of 64–158 states as follows:

"Notwithstanding the foregoing, in determining whether a transfer of assets from one foreign corporation to another foreign corporation constitutes an exchange described in section

where there was no immediate income tax to the foreign corporation involved in the exchange but where there was a dividend distribution at the same time and it was necessary to ascertain the earnings and profits of the foreign corporation for foreign tax credit purposes." 64 Col.L.Rev. at 1017.

9. See footnote 8, *supra.* McDonald also states that:
"By its terms, Revenue Ruling 64–158 is made applicable to transactions occurring after September 15, 1960. As to transactions occurring before that date, the tax-free liquidation and re-

organization provisions are inapplicable 'unless gain was not recognized to a United States taxpayer upon such transaction by virtue of these provisions.' In other words, if a pre-September 15, 1960 liquidation or reorganization involved a foreign corporation, and if no Section 367 ruling had been obtained, the transaction was regarded as a taxable one in all respects. The implication is that Section 367 was applicable to such a transaction regardless of whether any immediate tax effect resulted to a United States taxpayer." 64 Col.L.Rev. at 1017–1018.

332 or section 361 of the Code, a transaction occurring prior to September 15, 1960, shall not be considered to have the effect of a tax-free liquidation or reorganization, unless a United States taxpayer establishes that it qualified as such or unless gain was not recognized to a United States taxpayer upon such transaction by virtue of these provisions."

The latter "unless" clause obviously does not apply here because the provisions referred to are not operative without a § 367 advance ruling. As to the first "unless" clause, the United States taxpayer could not possibly establish that a transaction qualified as a tax-free reorganization without first getting an advance ruling under § 367 that the foreign corporation was, in fact, a "corporation" for tax purposes. Cf. 26 U.S.C. § 332.

More importantly, even if Rev.Rul. 64–158 is interpreted as establishing an "immediate tax effect" rule as to when a § 367 ruling will be necessary for foreign corporation reorganizations to take advantage of the tax-free reorganization

provisions of the I.R.C., the interpretation must take into account the express exception provided for in Rev.Rul. 64–157 and its necessary implications.[10] At minimum, the possibility of a foreign corporate reorganization generating taxable income to a United States taxpayer (shareholder) is sufficiently "immediate", by virtue of the special provisions designed to prevent U.S. tax avoidance through the use of foreign corporations, to warrant the necessity of obtaining an advance ruling under § 367.

Even assuming, however, that the practice in 1959 was that § 367 advance rulings were not *required* in cases involving potential FPHC income tax liability, no authority has been cited, nor has any substantial reason been suggested, as to why any distinction, for purposes of § 367, should be drawn between Subpart F income and FPHC income.[11] In fact, Subpart F is merely an extension of the concept embodied in the FPHC provisions. The inter-relationship of the provisions is clear. See 26 U.S.C. § 951(d).[12]

10. The taxpayer's quotation (emphasis supplied in the following) from the McDonald article is clearly taken out of context.

"May the 'effect' in such a liquidation be more remote or indirect and nevertheless invoke Section 367? In Revenue Ruling 64–157 the Service announced that a Section 367 ruling will be *required* in every case in which, apart from Section 332, there is gain upon the liquidation of a second-tier foreign subsidiary into a first-tier foreign subsidiary and in which such gain would constitute subpart F income to United States shareholders. As noted above, this result is consistent with the 'objective' approach. Is it consistent with the 'effect' approach? *Prior to this ruling, apparently the Service had indicated that a Section 367 ruling was unnecessary because of insufficient involvement of the foreign corporation with United States tax law, namely the absence of immediately taxable gain in the United States to the foreign corporation upon which the ruling would operate.* This view seems to be graphically illustrated by Revenue Ruling 64–158. But there were also the Sec-

tion 367 rulings that had been issued both where one foreign corporation was liquidated into another foreign corporation and the availability of a foreign tax credit from a dividend distribution thereafter was involved, and where two foreign corporations were involved and foreign personal holding company income resulted. Perhaps then the meaning of Revenue Ruling 64–157 is that the 'effect' approach is now to be given broader application than previously." 64 Col.L.Rev. at 1020. [Footnotes omitted.]

11. *Cf.* discussion in footnotes 7 and 10, *supra.*

12. That section provides:
"(d) Coordination with foreign personal holding company provisions.—A United States shareholder who, for his taxable year, is subject to tax under section 551(b) (relating to foreign personal holding company income included in gross income of United States shareholders) on income of a controlled foreign corporation shall not be required to include in gross income, for such taxable year, any amount under subsection (a) with respect to such company."
The foregoing provision clearly demon-

Leading authorities in the field of federal corporate taxation have noted the similarity of purpose between the FPHC and Subpart F provisions.

"Before 1962, the statutory pattern of exempting foreign corporations from United States tax on their foreign-source income and taxing these earnings to their United States shareholders only on repatriation—the 'deferral' privilege—was subject to an exception for 'foreign personal holding companies.' As already explained (supra ¶ 17.22), the tax-avoidance potential of such corporations is nullified by requiring their United States shareholders to report the corporate income as earned, even if it is not distributed to them. In 1962, a similar requirement was enacted for 'controlled foreign corporations,' under which their United States shareholders must report their pro rata share of certain categories of foreign income, even though it is not distributed to them.

.   .   .   .   .   .

Whether or not foreign corporations with American shareholders could be subject to the full force of United States taxation on their foreign income without violating international law, there are obvious difficulties in imposing such a tax if the corporation has some foreign shareholders; and Subpart F, like the foreign personal holding company provisions, sidesteps the problem by selecting the corporation's United States shareholders as its target." Bittker & Eustice, Federal Taxation of Corporations and Shareholders, Sec. 17–46.

Hence, it is clear that Rev.Rul. 64–157, which requires a § 367 ruling where, but for the application of § 332, Subpart F income would be generated, must necessarily apply to an identical case involving FPHC income. To rule otherwise would create a confusing and unnecessary exception within an exception. (*Cf.* § 951(d), *supra.*)

In sum, the Commissioner properly determined that the taxpayer, having failed to secure the advance ruling required by § 367, was not entitled to the tax treatment provided for by § 332, which would otherwise have rendered the transaction tax-free.

## II.

■ The question that remains is whether or not the income in dispute here was, in fact, FPHC income. The taxpayer argues that even if gain were to be recognized, such gain would not be FPHC income and, therefore, not taxable to it. At the outset, it should be noted that had plaintiff followed the appropriate advance ruling procedure, any discussion of whether the gains were FPHC income or profits and earnings would be completely unnecessary. Therefore, in determining what Congress' intent was in promulgating the FPHC provisions and determining whether they might have a harsh or unintended effect if applied literally, it must be recognized that concomitant procedures existed to mitigate, if not eliminate, such results. Moreover, the applicable Treasury Regulation, Section 1.543.1, clearly states that "gains from the sale of stock or securities" [which is defined as PHC income under § 543 and made applicable to FPHC's under § 543] shall include "gains from liquidating dividends and other distributions." In Lansing Broadcasting Co. v. Commissioner, 52 T.C. 299 (1969), aff'd, 427 F. 2d 1014 (6th Cir. 1970), the court held that even in the absence of an expressed inclusion of "gains from liquidations" in the regulations governing termination of Subchapter S status when more than 20% of a Subchapter S corporation's income is PHC income, the regulation would be construed to include liquidating dividends. The taxpayer argues that the *Lansing* case, in dicta, stands for the proposition that PHC income cannot arise from the liquidation of operating subsidiaries. Only the most lib-

strates that the Subpart F provisions merely expand the potential tax liability

of U. S. shareholders of foreign corporations.

eral interpretation of that case, one which I believe to be unwarranted, suggests such a broad rule. In fact, the court was only commenting that Congress' purpose in granting Subchapter S corporations special tax treatment was to allow certain *small businesses* to operate as corporations without corporate tax disadvantages. Therefore, it was argued that operating subsidiaries ought not to fall within the PHC provision of Subchapter S, Section 1372(e)(5), because that would defeat the purposes of the *Subchapter S* provisions. In essence, plaintiff is asking the court to ignore the explicit provisions of the statute and the regulations promulgated thereunder, because gain not falling within statutory provisions as FPHC income might later be classified as FPHC income to a parent corporation. Yet, whatever hardship the literal provisions of the tax laws may have caused the taxpayer could have been avoided if it had secured an advance ruling. There is no need to create exceptions where adequate exceptions already exist.

Accordingly, defendant's motion for summary judgment will be granted and plaintiff's motion for summary judgment will be denied.