## H. H. ROBERTSON COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2587–70. Filed October 10, 1972.

54

*William M. Horne, Jr.*, *Thomas A. Arbogast*, and *Norman W. Goldin*, for the petitioner.

*Louis A. Boxleitner* and *John C. Calhoun*, for the respondent.

OPINION

Raum, *Judge:* 1. *Earnings and profits of Robertson Holdings.*—In planning the liquidation of its wholly owned subsidiary, Robertson Holdings, in 1965, petitioner desired to take advantage of section 332 (a), I.R.C. 1954, which provides for nonrecognition of gain or loss "on the receipt by a corporation of property distributed in complete liquidation of another corporation." However, since Robertson Holdings was a foreign corporation, section 332(a) would not be applicable unless there were prior compliance with section 367, which then [3] provided:

SEC. 367. FOREIGN CORPORATIONS.

In determining the extent to which gain shall be recognized in the case of any of the exchanges described in section 332, 351, 354, 355, 356, or 361, a foreign corporation shall not be considered as a corporation unless, before such

---

[3] Sec. 367 was subsequently amended by sec. 1(a) of Pub. L. 91–681 (Jan. 12, 1971), 84 Stat. 2065, and, as amended, was applicable generally, pursuant to sec. 1(c) of that legislation, to transfers made after Dec. 31, 1967.

exchange, it has been established to the satisfaction of the Secretary or his delegate that such exchange is not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes. \* \* \*

In the absence of such prior clearance or "ruling" by the Commissioner under section 367, the transaction would have automatically failed to meet the nonrecognition requirements of section 332. See *Kinkel* v. *McGowan*, 188 F. 2d 734, 736–737 (C.A. 2), affirming 97 F. Supp. 43 (W.D. N.Y.); *Texas-Canadian Oil Corporation, Ltd.*, 44 B.T.A. 913; *Construction Aggregates Corp.* v. *United States*, 350 F. Supp. 726 (N.D. Ill.). Cf. *American Manufacturing Co.*, 55 T.C. 204, 231–232. And wide discretion is committed to the Commissioner under section 367, which had its origin in section 112(k) of the Revenue Act of 1932, 47 Stat. 198. The reports of both the House and Senate committees concerned with that legislation stated the pertinent nonrecognition provisions of the statute as applied to transactions involving foreign corporations were to be inoperative "unless prior to the exchange *the commissioner is satisfied* that the transaction does not have as one of its principal purposes the avoidance of taxes" (emphasis supplied). H. Rept. No. 708, 72d Cong., 1st Sess., p. 20 (1932); S. Rept. No. 665, 72d Cong., 1st Sess., pp. 26–27 (1932).[4]

In granting clearance under section 367 in the case of the liquidation of a foreign subsidiary it has been the Commissioner's practice to require as a condition to nonrecognition that the U.S. parent include in its income as a dividend the theretofore undistributed current and accumulated earnings and profits of the foreign corporation. If there were no liquidation and the earnings and profits of the foreign subsidiary were distributed over the years, they would be taxable as dividends to the U.S. parent; therefore, unless such earnings and profits were taxed as a dividend upon distribution of the subsidiary's assets to its parent upon liquidation, they would escape U.S. taxation forever as dividends in the hands of the U.S. corporation. The petitioner was fully aware of the Commissioner's practice [5] in this respect, and in applying for a section 367 clearance, it offered to report the earnings and profits of Robertson Holdings as a dividend. The Commissioner in turn accepted that offer, and in effect conditioned nonrecognition under section 332 upon petitioner's inclusion of Robertson Holdings' theretofore undistributed earnings and profits in its own gross income as a dividend.

---

[4] The delegation to the Commissioner of discretion to grant such rulings and the purpose therefor were also acknowledged at the time this provision was carried forward into the 1954 Code as sec. 367. H. Rept. No. 1337, 83d Cong., 2d Sess., p. A131 (1954); S. Rept. No. 1622, 83d Cong., 2d Sess., p. 272 (1954).

[5] The Commissioner's practice has since been reflected in the published guidelines set forth in Rev. Proc. 68–23, 1968–1 C.B. 821.

In its initial request for section 367 clearance petitioner had also sought to obtain a ruling in respect of the computation of the *amount* of Robertson Holdings' earnings and profits—i.e., as to the effect upon such earnings and profits of the 1964 distribution-in-kind to petitioner of the 77,000 shares of R. T. Africa. Upon learning that the matter of the computation of the amount of the earnings and profits would have required separate consideration by another branch of the Commissioner's office and might have delayed the section 367 clearance beyond the end of 1965, petitioner withdrew its request in that respect. Accordingly, the section 367 clearance was given by the Commissioner in accordance with petitioner's revised proposal, and in substance required petitioner to report as a dividend the subsidiary's earnings and profits, whatever they might be as properly computed in accordance with law.[6]

The nub of the present controversy between petitioner and the Government on this point is the extent to which the earnings and profits of the foreign subsidiary were reduced by its 1964 distribution of 77,000 shares of R. T. Africa to petitioner. Apart from that distribution, Robertson Holdings had undistributed earnings and profits in the amount of $5,269,367, as of the end of 1964. The R. T. Africa shares had a basis of $251,650 in Robertson Holdings' hands, and the parties have agreed that these shares had a fair market value of $1,925,000 on the date of distribution, December 22, 1964. There is no dispute that such distribution resulted in petitioner's receipt of a taxable dividend of $1,925,000. Secs. 301(b)(1)(C), 301(c)(1), and 316, I.R.C. 1954. And petitioner contends that earnings and profits must be diminished by that amount. The Government, on the other hand, argues that the distribution had the effect of reducing earnings and profits only by the amount of the basis of the R. T. Africa shares, namely, $251,650. It is well settled that the determination of a foreign corporation's earnings and profits, for purposes of the imposition of the U.S. tax, is to be made by the application of U. S. tax principles. *Steel Improvement & Forge Co.*, 36 T.C. 265, 277, reversed and remanded on other grounds 314 F. 2d 96 (C.A. 6); *Edward D. Untermyer*, 24 B.T.A. 906, 912, affirmed per curiam 59 F. 2d 1004 (C.A 2), certiorari denied 287 U.S. 647. Cf. *Biddle* v. *Commissioner*, 302 US. 573, 578–579. And although there is much force to petitioner's position in theory, the issue must be

---

[6] Petitioner attempts to make much out of the fact that in conjunction with both its original and revised requests for the sec. 367 ruling it submitted certain schedules that set forth in detail its version of the computation of earnings and profits. However, we think that any argument based upon the Commissioner's alleged acceptance of these schedules as the measure of his ruling on the amount of earnings and profits to be included as a dividend is completely without merit. The record is clear that the sec. 367 clearance was given on the basis that no ruling would be given as to the computation of the *amount* of the earnings and profits, and the Commissioner certainly was not bound by any of the computations in those schedules.

decided in the Government's favor by reason of the explicit provisions of section 312(a)(3) of the Code which read as follows:

SEC. 312. EFFECT ON EARNINGS AND PROFITS.

(a) GENERAL RULE.—Except as otherwise provided in this section, on the distribution of property by a corporation with respect to its stock, the earnings and profits of the corporation (to the extent thereof) shall be decreased by the sum of—

   (1) the amount of money,
   (2) the principal amount of the obligation of such corporation, and
   (3) the adjusted basis of the other property, so distributed.

These provisions authorize the reduction of Robertson Holdings' earnings and profits only by the amount of the basis of the R. T. Africa shares. We have no choice but to sustain the Commissioner's position on this issue, and petitioner has presented no persuasive argument to us that would justify our failing to give effect to section 312(a)(3). It is accordingly chargeable with having received a dividend on the liquidation of Robertson Holdings in the amount of $2,920,453, as urged by the Commissioner—a figure representing Robertson Holdings' earnings and profits, the computation of which is not disputed by petitioner if section 312(a)(3) is applicable—rather than in the amount of $1,247,103, as urged by petitioner, which is based upon earnings and profits computed by deducting the fair market value of the R. T. Africa shares upon their distribution.

Petitioner has argued that the Government's position is contrary in principle to *General Utilities Co.* v. *Helvering*, 296 U.S. 200 (1935), which held that unrealized appreciation in property distributed as a dividend-in-kind does not represent taxable income to the distributing corporation. The rule of that case has since been incorporated into the 1954 Code (sec. 311(a)). See S. Rept. No. 1622, 83d Cong., 2d Sess., p. 46. But the Government is not seeking here to impose any tax upon the distributing corporation, Robertson Holdings. Rather, the issue here is the effect of the distribution upon the earnings and profits of Robertson Holdings.[7] And while ordinarily such earnings and profits would

[7] Nor is the issue in this case the incidence of tax on the 1964 dividend-in-kind to petitioner of the R.T. Africa stock, which petitioner agrees is based on the fair market value of such stock at the time of distribution under secs. 301(b)(1)(C), 301(c)(1), and 316, I.R.C. 1954. Petitioner's reliance on the decisions of this Court in *Estate of Ida S. Godley*, 19 T.C. 1082, reversed 213 F. 2d 529 (C.A. 3), certiorari denied 348 U.S. 862, and *Fannie Hirshon Trust*, 12 T.C.M. 364, reversed 213 F. 2d 523 (C.A. 2), certiorari denied 348 U.S. 861, both of which arose under the 1939 Code, even if they were otherwise relevant, is therefore misplaced inasmuch as those cases concerned situations where the distributing corporation's earnings and profits were less than the fair market value of the appreciated property distributed, which is not the circumstance here.

Moreover, while it is true, as petitioner points out, that there is a suggestion in this Court's opinion in *Godley* that the Commissioner cannot attempt to accomplish the result prohibited in the *General Utilities* case indirectly by taxing the shareholder on the "unrealized appreciation" involved in a distribution of property (19 T.C. at 1091), that thought must be viewed in the light of the subsequently enacted provisions of sec. 312(a)(3) of the 1954 Code and the explanation of those provisions in the committee reports, as set forth hereinafter.

be reduced by the amount that is treated as a dividend in the hands of the recipient, Congress has provided otherwise in the situation before us.

Petitioner quite correctly points out that the net effect of reducing earnings and profits only by the basis of the distributed property would be to subject the distributee to tax in the long run upon all of the distributing corporation's earnings and profits computed in the normal manner plus an increment representing unrealized appreciation of the distributed assets. But this is precisely what Congress provided for as a result of section 312(a)(3), and that it clearly so understood is apparent from the reports of both the House and Senate committees that considered these provisions when they were enacted. An example described in S. Rept. No. 1622, 83d Cong., 2d Sess., makes this abundantly plain. At page 248 of that report, the Senate Finance Committee stated:

Subsection (a) provides the general rule for adjustments to earnings where property is distributed. If the distribution is in cash the earnings are decreased by the amount of such cash, and if it is in an obligation of the distributing corporation, the earnings are decreased by the principal amount thereof. If the distribution is in property the amount of the decrease is by the adjusted basis of such property. This rule is applicable whether the property has appreciated or depreciated in value. Thus, if property with a value of $100 is distributed but if there are only $75 of earnings and profits from which the distribution can be made, the taxable amount will be only $75. If the property cost the corporation only $50, however, its earnings and profits will be reduced only by $50, and $25 will remain in its earnings and profits account.

The foregoing example shows that although a distribution of appreciated property would be taxable up to the full amount of earnings and profits ($75), the earnings and profits account would be reduced only by the basis of the property ($50), leaving $25 in that account out of which further taxable dividends could be paid. A somewhat similar example appears in the report of the House Ways and Means Committee. See H. Rept. No. 1337, 83d Cong., 2d Sess., p. A94. Thus, Congress clearly understood that where appreciated property is distributed, the earnings and profits account is diminished only by the basis of the property, and that taxable dividends in the aggregate could be received in an amount exceeding the corporation's historical earnings and profits. Such excess would equal the amount of appreciation that was treated as a dividend upon distribution. This is the unequivocal effect of section 312(a)(3), and we can see no way around it to support petitioner's position.[3]

[3] A like result would also obtain under secs. 301(b)(1)(A) and 312(a)(3), I.R.C. 1954, in a similar situation where an *individual* shareholder received such a dividend distribution of appreciated property. Indeed, when it amended the statute in 1962 (sec. 5(a), Revenue Act of 1962, 76 Stat. 977) by adding sec. 301(b)(1)(C) to the Code—which provides that the amount of a distribution of property by a foreign corporation to a

It is to be noted that the net effect of taxing petitioner on dividends in an aggregate amount exceeding the distributing corporation's historical earnings and profits by the extent of such appreciation in the R. T. Africa shares, however, is mitigated by the provisions of section 301(d)(4), I.R.C. 1954, which provides that petitioner's basis in the R. T. Africa shares would be stepped up to the appreciated fair market value of the stock at the time of distribution. Petitioner, in fact, recognizes as much and has attempted to make some point of an offer on its part on brief to agree not to claim any such step-up in basis. However, we think the petitioner cannot alter by agreement what is the clear impact of the law as found in section 301(d)(4) any more than we can circumvent the requirement of section 312(a)(3) for the purposes of this case.

To be sure, petitioner has placed great reliance on the following language in the conference report accompanying the Revenue Act of 1962, concerning the application of section 367 to the reorganization of foreign corporations in response to the enactment of the subpart F provisions:

> Under present administrative rules, where corporate shareholders are involved the Treasury Department generally does not issue rulings under section 367 which permit the tax-free remittance to the United States of earnings and profits of foreign corporations. However, under existing practice a ruling permitting a tax-free exchange is generally given subject to a condition that an *appropriate amount* be included in the income of the domestic shareholder (thus negating the existence of a principal purpose to avoid U.S. tax). Such rulings will continue to be given even though a principal purpose of the transaction is (1) to terminate the activities of a foreign corporation which would result in tax to U.S. shareholders under the provisions of * * * [subpart F] and (2) to carry on such activities in the future through a domestic corporation.

> The conferees recognize that the problems in this area are complex and that particular aspects of the policy as explained above may require qualification and refinement as experience is gained in applying it to particular situations. [Emphasis supplied by petitioner. H. Rept. No. 2508, 87th Cong., 2d Sess., p. 35 (1962).]

Petitioner argues that it was therefore recognized by Congress that section 367 would be applied in such a manner as to require only the

---

domestic corporate distributee is the same as such a distribution to an individual shareholder, or the fair market value of the property received—Congress made clear that the "repatriation" of foreign-source income through a distribution of property was regarded as a taxable event similar in nature and of equal significance as a distribution of property out of corporate solution to an individual shareholder. H. Rept. No. 1447, 87th Cong., 2d Sess., pp. 26–27 (1962). See S. Rept. No. 1881, 87th Cong., 2d Sess., pp. 38–39 (1962). And it was at the point in time of the 1964 distribution of the R. T. Africa stock that petitioner realized, as it admits, dividend income of $1,925,000 reflecting the appreciated fair market value of such stock, while Robertson Holdings' earnings and profits were reduced, as Congress dictated in sec. 312(a)(3), merely by the United Kingdom holding company's " 'investment' " or basis in the stock. H. Rept. No. 1337, 83d Cong., 2d Sess., p. A94 (1954). See S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 46–47, 248 (1954).

inclusion in the domestic parent corporation's income of an "appropriate amount" to prevent the avoidance of U.S. tax. But it is obvious from the context of the quoted passage that such amount would be the "earnings and profits" of the foreign corporation. Moreover, as the last paragraph of the quoted passage recognizes, Congress once again placed authority in the Commissioner under section 367 to deal with "complex" problems in this area. We think the Commissioner under his ruling has attempted to achieve the tax policies enunciated by Congress by requiring the earnings and profits of Robertson Holdings, as adjusted under section 312(a)(3) in respect of the 1964 distribution of R. T. Africa stock, to be included in petitioner's income in 1965, and that this is the "appropriate amount."

It must be remembered that if there were no liquidation, all subsequent distributions by Robertson Holdings would be taxable as dividends up to the full amount of its earnings and profits as determined in accordance with section 312. And, as we have indicated above, p. 68, unless the earnings and profits were taxed as a dividend upon distribution of all of Robertson Holdings' assets in liquidation, they would escape taxation forever in petitioner's hands. Accordingly, the conclusion that the earnings and profits are the "appropriate amount" is not only plainly correct, but the Commissioner's ruling is well within the permissible range of his discretion under section 367. We do not find that the committee report relied upon by petitioner discloses any intention on the part of Congress calling for a different result in this case.[9]

---

[9] On brief petitioner has presented the arguments that its United States tax liability in connection with Robertson Holdings, its wholly owned foreign subsidiary, should be roughly approximated to the taxation of a foreign branch operation, and that in any case all that has occurred as a result of both the 1964 dividend of the R. T. Africa stock and the subsequent liquidation of the United Kingdom holding company was a restructuring within petitioner's commonly controlled corporate group resulting in no economic gain. But there are significant tax differences between conducting business abroad through branch operations and foreign subsidiaries, not the least of which is United States "tax deferral" on the foreign-source income of first- and second-tier foreign subsidiaries as in petitioner's case. Cf. H. Rept. No. 1447, 87th Cong., 2d Sess., pp. 57–58 (1962) ; S. Rept. No. 1881, 87th Cong., 2d Sess., pp. 78–79 (1962). Consequently, the full taxation of repatriated foreign-source income becomes of great significance, as Congress recognized in its revision of sec. 301(b)(1) by the Revenue Act of 1962. See H. Rept. No. 1447, 87th Cong., 2d Sess., pp. 26–27 (1962) ; S. Rept. No. 1881, 87th Cong., 2d Sess., pp. 38–39 (1962). Therefore, although the 1964 dividend here consisted of appreciated stock in a second-tier subsidiary, such appreciation was itself likewise probably related to earnings of R. T. Africa which had experienced United States tax deferral, and presumably would continue to do so after the so-called restructuring. In the circumstances, we think such considerations of past and continued tax deferral are clearly within the Commissioner's authority under sec. 367 to protect the revenues against possible tax avoidance. In any event, regardless of the philosophical correctness or incorrectness of the analogy to foreign branch operations, the provisions of sec. 312(a)(3) are applicable here, and it was within the range of the Commissioner's discretion to require under sec. 367 that all earnings and profits, as properly computed according to law, be included as a dividend, for such earnings and profits would otherwise escape United States taxation forever.

2. *Computation of the section 902 foreign tax credit for 1965.*—Petitioner raises the foreign tax credit issue only in the alternative, i.e., in the event that it should lose on the first issue. It objects to the Commissioner's computation of its 1965 so-called "indirect" or "deemed paid" foreign tax credit under section 902(a)(1) only if we should decide, as we have done, that the taxable dividend upon liquidation of Robertson Holdings is $2,920,453 (based upon earnings and profits computed by deducting only the basis of the R. T. Africa shares) rather than $1,247,103 (based upon earnings and profits computed by deducting the full fair market value of the R. T. Africa shares). The relationship between these two issues will appear more fully hereinafter. It may be stated meanwhile, however, that the Commissioner's computation of the foreign tax credit (as indicated in his revised Exhibit K) gives petitioner full credit for all creditable foreign taxes paid by Robertson Holdings, and that the effect of petitioner's position would be to allow it credit not only in respect of all creditable foreign taxes paid by Robertson Holdings during its entire existence, but also a further credit in respect of the difference between $2,920,453 (the final dividend based upon Robertson Holdings' earnings and profits as approved above) and $1,247,103 (the amount of the final dividend for which petitioner contends). That difference is $1,673,350, and is equal precisely to the unrealized appreciation of the R. T. Africa shares (fair market value of $1,925,000 minus basis of $251,650). But, as the record herein clearly shows, Robertson Holdings paid no tax on that unrealized appreciation, and to allow petitioner a foreign tax credit in respect of such unrealized appreciation would be to allow a credit for foreign taxes that were never in fact imposed or paid. In this connection, it must be kept in mind that the fundamental purpose of the foreign tax credit is the elimination of international double taxation. *American Chicle Co.* v. *United States,* 316 U.S. 450, 452; *National Cash Register Co.* v. *United States,* 400 F. 2d 820, 825–826 (C.A. 6), reversing 270 F. Supp. 930 (S.D. Ohio), certiorari denied 394 U.S. 917; *Steel Improvement & Forge Co.,* 36 T.C. 265, 282, reversed and remanded on other grounds 314 F. 2d 96 (C.A. 6). Therefore, inasmuch as Robertson Holdings otherwise distributed dividends in respect of which foreign tax credits could be claimed for *all* its creditable foreign taxes attributable to the "accumulated profits" from which such dividends were paid (as determined in the applicable years under section 902(a), I.R.C. 1954, before it was amended by section 9(a), Revenue Act of 1962, 76 Stat. 999, and under section 902(a)(1), as amended), it would seem to follow that no further foreign tax credit should be available since there was no foreign tax imposed to which it could relate. See *Steel Improvement & Forge Co.,* 36 T.C. at 280–282. Petitioner, how-

ever, argues that under a literal reading of the computation set forth in section 902(a)(1) for determining the indirect foreign tax credit, such a tax credit is nonetheless permitted.

Petitioner does not dispute that under its version of section 902 it would obtain a credit for taxes that were never in fact paid, but it in effect justifies its position on the ground that since section 312(a)(3) was used against it on the first ground, there is nothing wrong with obtaining such extraordinary benefits under section 902. Of course, if section 902 calls for the result urged by petitioner, that would be the end of the matter, just as section 312(a)(3) was found to be controlling on the first point. However, we do not so read section 902. The law in this respect is involved and highly complex, and an understanding of the statutory framework is essential to the consideration of this issue. And when the words of section 902 are given their correct meaning, no such result follows as the abnormal one for which petitioner contends. The situation is wholly unlike the one involving section 312(a)(3).[10]

Section 902 allows to a domestic corporation receiving a dividend from a foreign corporation a tax credit, in respect of the dividend, for specified foreign taxes incurred by the distributing foreign corporation on the "accumulated profits" from which it pays the dividend.[11] As will appear more fully hereinafter, the term "accumulated profits" as used in section 902 refers to a concept that is quite different from, although related to, the meaning of the more familiar and widely used term "earnings and profits." The statute, as amended by section 9(a), Revenue Act of 1962, 76 Stat. 999–1001, and as it was applicable to 1965, the year here in issue, provides in pertinent part as follows:

SEC. 902. CREDIT FOR CORPORATE STOCKHOLDER IN FOREIGN CORPORATION.

(a) TREATMENT OF TAXES PAID BY FOREIGN CORPORATION.—For purposes of this subpart, a domestic corporation which owns at least 10 percent of the voting

---

[10] There was no possible leeway in the interpretation of sec. 312(a)(3). Moreover, the result reached in respect of the first issue is hardly as horrendous as petitioner would have us believe. Not only was the result specifically contemplated by the House and Senate committees which sponsored the legislation, see *supra*, p. 71, but the 77,000 shares of R. T. Africa acquired a new and stepped-up basis in petitioner's hands. See *supra*, p. 72. That increase in basis was thus correlated with and indeed was equal precisely to the amount of the unrealized appreciation of the R. T. Africa shares. We can hardly take seriously petitioner's offer on brief to enter into an agreement under Rule 50 that it will not claim the benefit of such stepped-up basis in the future. It is the statute that sets forth the rules for determining basis, see *supra*, p. 72, and we know of no precedent for a party's waiving the benefit of a stepped-up basis spelled out in the statute in order to obtain a more immediate and perhaps greater benefit in another, although related, connection.

[11] A condition for the credit is that the domestic corporation satisfy certain ownership requirements in the foreign corporation. The only such ownership requirement applicable here is that the U.S. parent own at least 10 percent of the voting stock of the foreign corporation, and there is no dispute that such requirement has been met in this case

stock of a foreign corporation from which it receives dividends in any taxable year shall—

(1) to the extent such dividends are paid by such foreign corporation out of accumulated profits (as defined in subsection (c)(1)(A)) of a year for which such foreign corporation is not a less developed country corporation, be deemed to have paid the same proportion of any income, war profits, or excess profits taxes paid or deemed to be paid by such foreign corporation to any foreign country or to any possession of the United States on or with respect to such accumulated profits, which the amount of such dividends (determined without regard to section 78) bears to the amount of such accumulated profits in excess of such income, war profits, and excess profits taxes (other than those deemed paid); and

(2) to the extent such dividends are paid by such foreign corporation out of accumulated profits (as defined in subsection (c)(1)(B)) of a year for which such foreign corporation is a less developed country corporation, be deemed to have paid the same proportion of any income, war profits, or excess profits taxes paid or deemed to be paid by such foreign corporation to any foreign country or to any possession of the United States on or with respect to such accumulated profits, which the amount of such dividends bears to the amount of such accumulated profits.

\*          \*          \*          \*          \*          .   \*          \*

(c) APPLICABLE RULES.—

(1) ACCUMULATED PROFITS DEFINED.—For purposes of this section, the term "accumulated profits" means with respect to any foreign corporation—

(A) for purposes of subsections (a)(1) and (b)(1), the amount of its gains, profits, or income computed without reduction by the amount of the income, war profits, and excess profits taxes imposed on or with respect to such profits or income by any foreign country or any possession of the United States; and

(B) for purposes of subsections (a)(2) and (b)(2), the amount of its gains, profits, or income in excess of the income, war profits, and excess profits taxes imposed on or with respect to such profits or income.

The Secretary or his delegate shall have full power to determine from the accumulated profits of what year or years such dividends were paid, treating dividends paid in the first 60 days of any year as having been paid from the accumulated profits of the preceding year or years (unless to his satisfaction shown otherwise), and in other respects treating dividends as having been paid from the most recently accumulated gains, profits, or earnings.

It can be seen that section 902(a) prescribes different formulas by which the indirect foreign tax credit is to be determined in respect of dividends received from foreign corporations depending upon whether the distributing foreign corporation is a less developed country corporation; and it also sets out certain variables to be used in the calculation of the credit, to wit, "dividends \* \* \* paid," "accumulated profits," and the creditable foreign taxes ("income, war profits, or excess profits taxes"). The parties have stipulated that Robertson Holdings was "not a less developed country corporation." Therefore section 902(a)(1), rather than 902(a)(2), applies in this case and the

applicable formula for computing the indirect foreign tax credit is as follows: [12]

$$\frac{\text{Dividends received}}{\begin{array}{c}\text{Accumulated profits in}\\\text{excess of foreign taxes}\end{array}} \times \begin{array}{c}\text{Foreign taxes paid}\\\text{by foreign corporation}\end{array} = \begin{array}{c}\text{Indirect foreign tax}\\\text{credit}\end{array}$$

There is no dispute between the parties as to the amount of creditable foreign taxes paid by Robertson Holdings. The controversy focuses primarily on the computation of the "dividends" to be used in the numerator of the applicable fraction, which will be considered in detail hereinafter.

At the outset, we note that the term "accumulated profits" in the denominator of the section 902(a)(1) apportioning fraction was redefined in the Revenue Act of 1962. Prior thereto, "accumulated profits" was defined in section 902(c)(1), I.R.C. 1954, as total profits less foreign taxes. For reasons which the parties agree are distinct from the questions here in issue,[13] section 902(c)(1)(A), I.R.C. 1954, as

[12] Sec. 9(e)(1), Revenue Act of 1962, 76 Stat. 1001, provides that the formula dictated by sec. 902(a)(1), as amended by the Revenue Act of 1962, applies to any distribution received by a domestic corporation after Dec. 31, 1964, and therefore applies to both the $3,366,658 cash dividend distributed on Jan. 20, 1965, and the dividend under the sec. 367 ruling at the time of the liquidation of Robertson Holdings on Dec. 28, 1965.

[13] The redefinition of "accumulated profits" occurred as a consequence of the addition of sec. 78, I.R.C. 1954, to the Code by sec. 9(b), Revenue Act of 1962, 76 Stat. 1001. Congress sought to remedy by that provision what it considered a "double allowance for foreign income taxes" in computing the U.S. tax base in respect of foreign dividend income. H. Rept. No. 1447, 87th Cong., 2d Sess., pp. 50–52; S. Rept. No. 1881, 87th Cong., 2d Sess., pp. 66–67 (1962). See Staff of the Joint Committee on Internal Revenue Taxation, General Explanation of Committee Discussion Draft of Revenue Bill of 1961 [Revenue Act of 1962] (Prepared for the Committee on Ways and Means), pp. 23–24 (1961). Such double allowance arose because the U.S. tax base was determined on dividends remitted to domestic shareholders of foreign corporations, which meant that the amount of foreign tax was effectively allowed as a *deduction* since taxable dividends could only be paid out of net foreign income remaining after the payment of foreign tax (i.e., accumulated profits net of foreign tax under secs. 902(a)(1) and 902(c)(1)(A) as those sections now read). In addition, the indirect foreign tax credit was also available in computing the U.S. tax. Congress therefore enacted sec. 78 which requires a taxpayer claiming the benefits of the sec. 902(a)(1) foreign tax credit also to include in income as a dividend the amount of the credit under sec. 902(a)(1), as amended by the Revenue Act of 1962, or in other words, to "increase, or 'gross-up,' * * * [its] U.S. tax base by including in it the amount of foreign income paid in taxes which is attributable to the dividend received." H. Rept. No. 1447, 87th Cong., 2d Sess., p. 52 (1962); S. Rept. No. 1881, 87th Cong., 2d Sess., p. 68 (1962). See sec. 78, I.R.C. 1954. This provision applies only to dividends received from foreign corporations which are not less developed country corporations, and in respect of which the calculation of the indirect credit is thus computed according to the formula set out in sec. 902(a)(1), as amended. As a consequence of sec. 78 "gross-up," the total profits of the foreign corporation in respect of a particular dividend would be taken into account for U.S. tax purposes, thereby eliminating the prior "deduction" and hence "double allowance" of foreign taxes in computing U.S. tax. Therefore, Congress decided to dispense with the so-called *American Chicle* limitation which had previously required a taxpayer claiming the benefits of the indirect foreign tax credit under sec. 902 to first determine the amount of foreign tax paid specifically in respect of total profits net of foreign tax before applying the formula still found in sec. 902(a)(1) as amended. *American Chicle Co.* v. *United States*, 316 U.S. 450, 452–453. See H. Rept. No. 1447, 87th Cong., 2d Sess., pp.

amended by section 9(a), Revenue Act of 1962, 76 Stat. 1000, now defines "accumulated profits" to mean total profits rather than net profits after foreign tax. The applicable fraction set forth above, however, was not changed as a consequence of this redefinition. Both before and after the Revenue Act of 1962 the denominator of the particular fraction was total profits less foreign taxes imposed thereon. Prior to the amendments to section 902 effected by section 9(a) of the Revenue Act of 1962 the denominator was summarized by the term "accumulated profits" (i.e., total profits minus foreign taxes) under the definition then applicable. After the Revenue Act of 1962, the denominator of the fraction became "accumulated [or total] profits in excess of" foreign taxes, which is exactly the same factor previously characterized simply as "accumulated profits." [14]

Further, it is most important in this case to understand the essential nature of the term "accumulated profits," whether computed before or after the Revenue Act of 1962. That term is sharply to be distinguished from the familiar "earnings and profits," which embodies primarily the concept of an *aggregate* of a corporation's undistributed profits realized, usually from February 28, 1913, to the time in question, and out of which taxable dividends are payable without regard generally to the year or years when such profits were earned or realized. See sec. 316(a)(1), I.R.C. 1954. The term "accumulated profits" in respect of the foreign tax credit, on the other hand, is solely an *annual* concept. To be sure, like criteria are employed in determining "earnings and profits" and "accumulated profits" (see Rev. Rul. 63–6, 1963–1 C.B. 126, 127–128; Rev. Rul. 69–447, 1969–2 C.B. 153; cf. sec. 1.902–3

A79–A82 (1962); S. Rept. No. 1881, 87th Cong., 2d Sess., pp. 222–226 (1962). In other words, after the Revenue Act of 1962 it was possible in such a situation to claim the indirect credit for all creditable taxes imposed on the foreign corporation's total profits and not just in respect of such taxes paid on accumulated profits, or total profits net of foreign tax as under prior law. Congress achieved this end by merely redefining "accumulated profits" in sec. 902(c)(1)(A) to mean total profits, and adjusting the denominator in the sec. 902(a)(1) fraction to read "accumulated profits in excess" of foreign tax. As both the House and Senate made clear, the "result is to continue * * * the use of the ratios under existing law, but because of the amendment to section 902(c) the amount against which the ratios operate is increased." H. Rept. No. 1447, 87th Cong., 2d Sess., pp. A79–A80 (1962); S. Rept. No. 1881, 87th Cong., 2d Sess., p. 223 (1962). In this respect it is to be noted that the practical source of the foreign corporation's dividend distributions to the domestic corporation still remained its total profits after foreign taxes had been paid, and that the sec. 78 "gross-up" occurs after the credit is computed under sec. 902(a)(1).

[14] In view of the fact that the denominator of the applicable fraction is actually the same (total profits minus foreign taxes with respect thereto) both before and under the 1962 Act, we shall use the term "accumulated profits" generally herein as referring to that denominator—i.e., as the source from which taxable dividends may be paid each year—unless, in the particular context, it should become necessary to differentiate between the definition of "accumulated profits" as it appeared prior to the 1962 Act and as it appears therein.

(c), Income Tax Regs.), but they are nevertheless distinct concepts and each serves a different, although related, function in our tax law. It is of critical importance to determine the "accumulated profits" of each year, so that they can be matched against the foreign taxes paid for *that* year, and so that when dividends are paid "out of" or "from" such "accumulated profits," a foreign tax credit may properly be computed as a portion (in accordance with the statutory formula) of the foreign taxes paid in respect of the "accumulated profits" of *that* year. The annual nature of this concept was of pivotal significance in *General Foods Corporation,* 4 T.C. 209, which is generally regarded as a leading case in this field, and in which the Court stated (p. 216) :

The [statute] * * * gives the term "accumulated profits" a particular meaning * * * The meaning of "accumulated profits," as defined in the statute, can not be given effect when dividends are paid in part from prior years unless the dividends are segregated to separate years. The [statute] * * * gives the respondent the right to determine that segregation. Taxes are imposed on the profits of an accounting year or period and the term "accumulated profits" as defined in the [statute] * * * would indicate a meaning of *annual accumulated profits* rather than accumulated profits in the nature of surplus. To properly give effect to the language of the [statute] * * *, *it is necessary to relate the tax credit to the particular year or years in which the accumulated profits (from which the dividends were paid) were earned and taxed.* * * * [Emphasis supplied.]

Thus, as noted in *General Foods,* it is essential not only to compute the "accumulated profits" separately for each year but also to allocate a particular dividend to the "accumulated profits" of a particular year or years. And in this latter respect section 902(c)(1) provides:

SEC. 902. CREDIT FOR CORPORATE STOCKHOLDER IN FOREIGN CORPORATION.

(c) APPLICABLE RULES.— .
(1) ACCUMULATED PROFITS DEFINED.— * * *

\*. \* \* \* \* \* \*

The Secretary or his delegate shall have full power to determine from the accumulated profits of what year or years such dividends were paid, treating dividends paid in the first 60 days of any year as having been paid from the accumulated profits of the preceding year or years (unless to his satisfaction shown otherwise), and in other respects treating dividends as having been paid from the most recently accumulated gains, profits, or earnings.

Accordingly, under these provisions a dividend is allocated first to the full extent that it can be absorbed by the "accumulated profits" of the most recent year from which it was paid; the remainder is then allocated to the "accumulated profits" of the next most recent year to the extent that it can be absorbed by such "accumulated profits," and so on down the years. A separate foreign tax credit is

then computed for each of the years to which the dividend has been allocated, and the determination for each such year is made only in respect of that portion of the dividend that is allocated to such year. The fraction pursuant to the statutory formula (dividends over accumulated profits) will thus be different for each year, and that fraction is multiplied by the foreign taxes paid for that year, with or without the *American Chicle* limitation (see fn. 13 *supra*), depending upon the year involved.[15] The foreign tax credit under section 902 is then determined for the year in which the dividend was paid by adding together the separate credits thus computed for each of the years from the accumulated profits of which the dividend was paid. *General Foods Corporation*, 4 T.C. 209. Cf. *American Chicle Co.* v. *United States*, 316 U.S. at 454.

With the foregoing as background, we now consider more specifically the matter of the computation of the amount of the section 902 credit allowable to petitioner against its U.S. taxes for 1965. Petitioner was chargeable with having received only two dividends in 1965 from Robertson Holdings: the cash dividend of $3,366,658 paid to it on January 20, 1965, and the $2,920,453 dividend upon liquidation pursuant to the section 367 ruling. As noted in our findings, both the Commissioner and the petitioner itself (on its return for 1965) treated the $3,366,658 cash dividend as having been paid from the accumulated profits of years prior to 1965. Since that dividend was paid within the first 60 days of 1965, the Commissioner was empowered under section 902(c)(1) to treat it "as having been paid from the accumulated profits of the preceding year or years (unless to his satisfaction shown otherwise)." And petitioner has made no contention that this dividend should not be attributed to the "accumulated profits" of prior years.

Accordingly, the total foreign tax credit for 1965 under the rule of the *General Foods* case will be the sum of: (1) The credits for the years prior to 1965 separately computed for each such year to the extent that they relate to that portion of the $3,366,658 cash dividend attributed to "accumulated profits" of each such year; and (2) the credit in respect of the $2,920,453 liquidation dividend, consisting first of a credit computed with respect to foreign taxes paid in 1965 "to the extent" (sec. 902(a)(1)) that such dividend was paid "out of" (sec. 902(a)(1) or "from" (sec. 902(c)(1)) the "accumulated profits" of Robertson Holdings in 1965 ($1,269,394) plus such further credits, if any, as may be computed in respect of the remaining portion of that dividend that may be treated as having been paid "out of"

---

[15] The Revenue Act of 1962 provided for a gradual "phase out" of the *American Chicle* limitation. Thus, that limitation was not to be applicable at all with respect to any dividend paid after Dec. 31, 1964, but was to remain applicable to dividends paid in 1963 or 1964 to the extent that they were paid from accumulated profits of a taxable year prior to 1963. See sec. 9(e) of the Revenue Act of 1962; sec. 1.902-5(a), Income Tax Regs.

or "from" the "accumulated profits" of prior years. We use the words "if any" to take into account the possibility, which actually exists here as will be seen shortly, that there are no prior years having any remaining "accumulated profits" out of which the excess portion of that dividend could have been paid. To understand the operation of section 902 in respect of this issue requires a painfully tedious examination of the pertinent figures going back to the beginning of Robertson Holdings' existence in 1952.

We start first with a schedule (based upon our findings and stipulated exhibits), showing for each of the years 1952 through 1963: The total profits of Robertson Holdings separately computed for each such year, the foreign taxes paid in respect thereof, the total profits for each year after such taxes, the cash dividends paid during each such year, and the remaining "accumulated profits" of each year out of which dividends could be paid in 1964 and 1965. Then, secondly, we consider the extent to which the 1964 dividend of the R. T. Africa shares and the 1965 cash dividend of $3,366,658 were paid "out of" the accumulated profits for 1964 and the remaining "accumulated profits" of the pre-1964 years, on a year-by-year basis. And finally, we address ourselves to the $2,920,453 dividend on liquidation in 1965, to determine whether the credit in respect thereof may include any component attributable to foreign taxes paid in years prior to 1965, in addition to the component which accords petitioner full credit for Robertson Holdings' 1965 taxes.

The schedule to which we adverted at the beginning of the preceding paragraph is as follows:

ROBERTSON HOLDINGS

| Year | Total profits [1] | Income, etc., taxes paid | Profits after taxes [2] (2) minus (3) | Total cash dividends paid | Remaining "accumulated profits" of each year available for distribution (4) minus (5) |
|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) |
| 1952 | $9,413 | $3,931 | $5,482 | | $5,482 |
| 1953 | 1,466,758 | 811,779 | 654,979 | $243,670 | 411,309 |
| 1954 | 968,164 | 432,586 | 535,578 | 157,032 | 378,546 |
| 1955 | 1,069,163 | 505,487 | 563,676 | | 563,676 |
| 1956 | 2,244,374 | 1,077,678 | 1,166,696 | 84,916 | 1,081,780 |
| 1957 | 2,033,105 | 975,173 | 1,057,932 | 363,877 | 694,055 |
| 1958 | 1,546,372 | 804,442 | 741,930 | 291,102 | 450,828 |
| 1959 | 1,343,580 | 713,521 | 630,059 | 310,086 | 319,973 |
| 1960 | 1,440,474 | 726,135 | 714,339 | 341,096 | 373,243 |
| 1961 | 589,582 | 56,770 | 532,812 | 372,103 | 160,709 |
| 1962 | 1,015,039 | 91,996 | 923,043 | 449,627 | 473,416 |
| 1963 | 479,075 | 69,149 | 409,926 | 186,052 | 223,874 |

[1] Equal to "accumulated profits" under effective provisions of Revenue Act of 1962.
[2] Equal to "accumulated profits" for years prior to effective provisions of Revenue Act of 1962.

The computation of the foreign tax credit in respect of the 1964 distribution of the R. T. Africa shares is important here for two reasons: (a) Since petitioner's liability for its 1964 as well as its 1965

taxes is before the Court, the computation of the proper foreign tax credit allowable against its 1964 U.S. taxes is essential in order to compute its correct liability under Rule 50; and (b) the extent to which that distribution is regarded as having been paid out of "accumulated profits" of particular pre-1964 years will affect the determination as to which years the subsequent 1965 cash dividend in the amount of $3,366,658 may be attributed. In computing the 1964 foreign tax credit relating to the distribution of the R. T. Africa shares, the first principle to be applied is that this dividend is to be taken into account to the full extent of the fair market value of those shares ($1,925,000) and not to the lesser extent of their basis. This was made clear in *National Carbon Co.*, 2 T.C. 57, involving comparable statutory provisions under earlier law.

In *National Carbon*, the Commissioner attempted to prevent the taxpayer from obtaining a foreign tax credit measured by the full fair market value of appreciated assets which its foreign subsidiary had distributed to it, and which, as in the present case, was treated as a dividend to the U.S. parent to the full extent of its fair market value. The Commissioner argued that since the foreign subsidiary had not paid any taxes on the unrealized appreciation, no foreign tax credit should be allowable in respect thereof. But the Court found that there were ample earnings from sources *other* than the unrealized appreciation which could support the distribution, and it disapproved the Commissioner's position that was based upon the "earmarking of the distribution as having been made out of the unrealized appreciation." 2 T.C. at 61. Accordingly, the credit was computed upon the basis of the full fair market value of the distributed assets which had also served as the measure of the taxable dividend. A like result was reached in *Central Aguirre Sugar Co.*, 24 T.C. 630, and the legislative history makes clear that the same rule applies in respect of the statutory provisions now before us.[16] The significant thing is that the appreciated

---

[16] Sec. 301(b)(1)(C) of the 1954 Code, providing that a corporation receiving a distribution of property must take into account its fair market value, was added to the Code by sec. 5(a) of the Revenue Act of 1962. The House bill, however, had provided that for purposes of the foreign tax credit under sec. 902, the amount of distributions in property other than money would be the lesser of the adjusted basis or fair market value, i.e., as provided in sec. 301(b)(1)(B) of the Code. H.R. 10650, 87th Cong., 2d Sess., sec. 5(d) (1962). See H. Rept. No. 1447. 87th Cong., p A38–A39 (1962). But the Senate eliminated this latter provision (S. Rept. No. 1881, 87th Cong., 2d Sess., p. 39 (1962)), and the House receded (H. Rept. No. 2508, 87th Cong., 2d Sess., p. 18 (1962)). The Senate committee stated (S. Rept. No. 1881, *supra*, p. 39) :

"Your committee believes that since the distribution itself is to be taken into account at its fair market value, it would only be appropriate for purposes of determining the foreign tax credit, allowable with respect to this same distribution, to treat this distribution as sharing in the creditable foreign taxes in proportion to the fair market value of the distribution, rather than in proportion to its adjusted basis as under the House bill. This will maintain the current practice with respect to the valuation of the distribution, for purposes of allowing a foreign tax credit, in the case of those distributions in kind which under existing law already are taxed to the corporate recipients only at their fair market value."

assets are merely the means employed for distributing corporate earnings unrelated thereto, and the situation is to be sharply distinguished from the one where no other earnings or "accumulated profits" are available and a foreign tax credit is in substance sought only in respect of untaxed appreciation—a matter that we will discuss more fully hereinafter. For present purposes, however, the full amount of the fair market value of the R. T. Africa shares ($1,925,000) may be taken into account in computing the *1964* foreign tax credit, since there are ample "accumulated profits" to support that distribution.

In determining the procedure to be followed in computing the 1964 foreign tax credit we approve the method employed by the Government in its revised Exhibit K, which we now explain to the extent that it is pertinent here. For the year 1964 Robertson Holdings had taxable income in the amount of $215,188, paid foreign taxes in the amount of $82,712, and had net "accumulated profits" in respect of that year in the amount of the difference, namely, $132,476. It paid no dividends in 1964, apart from its distribution of the R. T. Africa shares. Accordingly, in determining what "accumulated profits" were to be charged with the $1,925,000 dividend, the Commissioner first ascribed to it the entire net "accumulated profits" of the most recent year (1964), namely, $132,476. He then treated the remaining portion of that $1,925,000 dividend as having been paid successively from the most recent available "accumulated profits" of the pre-1964 years (as shown in the last column of the schedule appearing above at p. 81), until the full amount of the dividend was exhausted.

Thus, the Commissioner determined, in accordance with section 902(c)(1), that the $1,925,000 dividend distributed in 1964 was paid "from" the "accumulated profits" of the following years and in the following amounts:

| Year | Amount | Year | Amount |
|---|---|---|---|
| 1964 | $132,476 | 1960 | $373,243 |
| 1963 | 223,874 | 1959 | 319,973 |
| 1962 | 473,416 | 1958 | 241,309 |
| 1961 | 160,709 | | |
| | | Total | 1,925,000 |

Except for 1958, the amount charged against the "accumulated profits" of each of the foregoing years was the full amount of such "accumulated profits" which had not theretofore been distributed. As to 1958, on the other hand, only a portion ($241,309) of the theretofore undistributed "accumulated profits" was required to complete the attribution of the $1,925,000 dividend to the various years. And since the available undistributed "accumulated profits" for 1958 immediately prior to the 1964 distribution of the R. T. Africa shares amounted to $450,828, there remained after that distribution undistributed "ac-

cumulated profits" for 1958 in the amount of $209,519 ($450,828 minus $241,309).

Although the Commissioner did not make the final computation of the credits themselves in his revised Exhibit K, there would appear to be no serious problem in that final step, as explained in the margin below,[17] and we do not understand that petitioner objects to the benefit of the credit against its 1964 U.S. taxes based upon the allocations in that exhibit. Certainly, we find no clear statement in its briefs disavowing such credit, or proposing a different computation that would result in a different credit for 1964.

We are now at the point where it becomes necessary to compute the credit in respect of the January 20, 1965, cash dividend of $3,366,658. As noted above, p. 80, that dividend may not be charged in any part against the 1965 "accumulated profits" of Robertson Holdings, since it is treated as having been paid out of the "accumulated profits" of prior years, starting with the most recent year in which there are any undistributed "accumulated profits." And, as the foregoing discussion in respect of the 1964 dividend of the R. T. Africa shares discloses, that most recent year is 1958 since the 1964 dividend absorbed all of the available "accumulated profits" of the years 1959 through 1964 and part of the available "accumulated profits" of 1958. Accordingly, starting with the accumulated profits of $209,519 remaining in 1958 after the R. T. Africa distribution, the Commissioner proposed to allocate the $3,366,658 cash dividend to that 1958 remainder and to the "accumulated profits" of all of the years prior thereto to the full extent that they were then available (as shown in column (6) of the schedule, *supra*, p. 81). That allocation was as follows:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1958 | $209, 519 | 1954 | $378, 546 |
| 1957 | 694, 055 | 1953 | 411, 309 |
| 1956 | 1, 081, 780 | 1952 | 5, 482 |
| 1955 | 563, 676 | | |
| | | Total | 3, 344, 367 |

The total credit with respect to the 1965 cash dividend, in accordance with the rule of the *General Foods* case, is then equal to the sum

[17] Thus, as to 1964, when all of the "accumulated profits" for that year were assigned to the $1,925,000 distribution, the partial credit would appear to be $\frac{132,476}{132,476} \times \$82,718$. As to 1963, however, some of the "accumulated profits" of 1963 had previously been distributed in cash during that year, and only $223,874 of the 1963 "accumuated profits" remained against which the $1,925,000 distribution could be charged. Accordingly, based upon the figures in the schedule set forth above, p. 81, the formula for computing the 1963 component of the 1964 credit would appear to be $\frac{223,874}{409,926} \times \$69,149$. The remaining components would be similarly computed for the years 1962 down to 1958. Of course, all these credits would be subject to any applicable limiting statutory provisions (e.g., the *American Chicle* limitation), and the final credit for 1964 would be the sum of the foregoing components thus computed.

of the partial credits separately computed (in a manner similar to that employed in fn. 17 *supra*) for each of the years 1952–58 based on the foregoing allocation of that dividend to all of the available "accumulated profits" for those years. Thus, although this procedure gives petitioner a foreign tax credit to the full extent of the creditable foreign taxes applicable to the "accumulated profits" out of which the cash dividend was paid, it will be seen that there is a residue of $22,291 of the cash dividend ($3,366,658 minus $3,344,367) that was unsupported by any available "accumulated profits," with the consequence that no foreign taxes had ever been paid in respect of that residue, and for which no foreign tax credit was accordingly allowable. We shall comment more fully upon this $22,291 item in connection with our consideration of the final dividend of $2,920,453, to which we now turn.

As shown in our findings, Robertson Holdings had total profits ("taxable income") in the amount of $1,422,921 in 1965 and paid foreign creditable taxes in respect thereof in the amount of $153,527, leaving a remainder of $1,269,394 in "accumulated profits" for 1965 "out of" which a dividend could be paid. Accordingly, the 1965 dividend of $2,920,453 on liquidation of Robertson Holdings—although fully supported by "earnings and profits" (as we have held in point 1 as a consequence of sec. 312(a)(3))—could not have been distributed out of "accumulated profits" of 1965 to any greater extent than $1,269,394. Therefore, in applying the section 902(a)(1) formula

$$\frac{\text{Dividends}}{\substack{\text{Accumulated profit in excess} \\ \text{of foreign taxes}}} \times \text{Foreign taxes,}$$

the Commissioner proposes to determine the foreign tax credit in respect of the dividend on liquidation as follows:

$$\frac{1,269,394}{1,269,394} \times \$153,527$$

Obviously, this formula has taken the $2,920,453 dividend into account only to the extent of the available $1,269,394 "accumulated profits" for 1965. And if there were any available "accumulated profits" for pre-1965 years, the remaining portion of the $2,920,394 dividend, namely, $1,651,059 ($2,920,453 minus $1,269,394), would be attributed to such years and further components of the 1965 credit would be added in respect of such attributions under the rule of *General Foods*, as was done in connection with the dividend of the R. T. Africa shares and the 1965 cash dividend. But, under the Commissioner's computation, *full* credit had already been accorded for the creditable foreign taxes paid on *all* the "accumulated profits" of the pre-1965 years, through the application of the statutory formula, pur-

suant to the rule of the *General Foods* case, in respect of the various dividends paid out of the "accumulated profits" of all the years up to and including 1964. There thus remained no further available "accumulated profits" of any of those years to which the $1,651,059 remaining portion of the 1965 terminal dividend could be attributed. We hold that the Commissioner's method is correct.

As we understand petitioner's objection to this computation of the 1965 credit, it may be stated as follows: The word "dividend" as used in section 902(a) has the same meaning as "dividend" in section 316 (citing *Central Aquirre Sugar Co.*, 24 T.C. 630; sec. 1.902–3(f), Income Tax Regs.), and since the terminal dividend is $2,920,453 for purposes of section 316, it is that amount which must appear in the numerator of the section 902(a) fraction. If that course were followed, then the numerator would obviously be greater than the denominator, and the allowable foreign tax credit would thus be greater than the foreign taxes actually paid in 1965 in respect of the "accumulated profits" of 1965. Petitioner attempts to justify this result on the ground that it conforms precisely to the literal language of section 902(a), and that it should be accorded the benefit of such literal application of section 902(a), just as section 312(a)(3) was applied against it in point 1. We find petitioner's position unsound, not only because it is inconsistent with the basic statutory purpose of eliminating double taxation,[18] but also because not even a literal reading of section 902(a) calls for the result urged by petitioner.

We may well accept petitioner's premise that "dividend" as used in section 902(a)(1) has the same meaning as "dividend" in section 316. But this is a far cry from the conclusion that since $2,920,453 represents a taxable section 316 dividend such amount must also be included in the numerator of the section 902(a)(1) fraction. For section 902(a)(1), fairly construed, does not require the full amount of the dividend to be included in the numerator. To the contrary, section 902(a)(1) provides that:

SEC. 902. CREDIT FOR CORPORATE STOCKHOLDER IN FOREIGN CORPORATION.

(a) TREATMENT OF TAXES PAID BY FOREIGN CORPORATION.—For purposes of this subpart, a domestic corporation which owns * * * voting stock of a

---

[18] It has been recognized on a number of occasions that the provisions of sec. 902 (or comparable provisions under prior law) must be viewed in the light of the general purpose of the statute which is limited to the relief of double taxation and nothing more. *National Cash Register Co.* v. *United States*, 400 F. 2d 820, 826 (C.A. 6), reversing 270 F. Supp. 930 (S.D. Ohio), certiorari denied 394 U.S. 917; *Associated Telephone & Telegraph Co.* v. *United States*, 306 F. 2d 824, 832 (C.A. 2), reversing and affirming 199 F. Supp. 452 (S.D. N.Y.), certiorari denied 371 U.S. 950. Cf. *Gentsch* v. *Goodyear Tire & Rubber Co.*, 151 F. 2d 997, 1000 (C.A. 6), affirming 59 F Supp. 829 (N.D. Ohio).

foreign corporation from which it receives dividends in any taxable year shall—

(1) *to the extent* such *dividends* are paid by such foreign corporation *out of accumulated profits* (as defined in subsection (c)(1)(A)) of a year for which such foreign corporation is not a less developed country corporation, *be deemed to have paid the same proportion of any* income, war profits, or excess profits *taxes paid* or deemed to be paid *by such foreign corporation* to any foreign country or to any possession of the United States *on or with respect to such accumulated profits,* which the amount of such dividends (determined without regard to section 78) bears to the amount of such accumulated profits in excess of such income, war profits, and excess profits taxes (other than those deemed paid) ; * * * [Emphasis supplied.]

Thus, although the denominator is equal to the foreign corporation's "accumulated profits in excess of * * * [creditable foreign] taxes," the numerator is limited "to the extent such dividends are paid * * * *out of* accumulated profits (as defined in subsection (c)(1)(A)) of a year." [19] As applied to the present case, only that portion of the $2,920,453 dividend that was "paid * * * out of" Robertson Holdings' 1965 "accumulated profits" may become the numerator of the section 902(a)(1) fraction in order to determine the "proportion of * * * [creditable foreign] taxes paid * * * by * * * [Robertson Holdings] on or with respect to such accumulated profits," for it is with respect to the dividends as thus limited that section 902(a)(1) goes on to refer to the proportion "which the amount of *such* dividends * * * bears to the amount of such accumulated profits in excess of such * * * [creditable foreign] taxes." (Emphasis supplied.) The term "such dividends" obviously refers to the dividends that were paid "out of" the "accumulated profits." While these provisions hardly reflect a desirable standard of lucid prose, their meaning is not obscure.

The draftsmen of section 902(a)(1) were plainly attempting in a cumbersome way, to spell out a credit in respect of foreign taxes

---

[19] Indeed, the statute has provided for this approach since the Revenue Act of 1921, under which the credit was allowed for taxes imposed on "or with respect to the accumulated profits of such foreign corporation *from which such dividends were paid.*" (Emphasis supplied.) Sec. 240(e), Revenue Act of 1921, 42 Stat. 259. Cf. *American Chicle Co.* v. *United States,* 316 U.S. at 453–454. Identical language existed in sec. 902(a), I.R.C. 1954, before it was amended by sec. 9(a), Revenue Act of 1962, 76 Stat. 999. And although the amendments effected by the Revenue Act of 1962 caused certain changes in the phrasing of the section to accommodate an increase in the amount of creditable tax against which the fraction operates, as already indicated (see *supra,* fn. 13, pp. 77–78) Congress otherwise intended no change in the applicable apportioning fraction in sec. 902(a)(1). H. Rept. No. 1447, 87th Cong., 2d Sess., pp. A79–A80 (1962) ; S. Rept. No. 1881, 87th Cong., 2d Sess., p. 223 (1962). Thus, sec. 902(a), as amended, provides for the indirect foreign tax credit in respect of "dividends paid * * * *out of accumulated profits*" (emphasis supplied) as defined differently for corporations which are less developed country corporations and those which are not. See sec. 902(c)(1) (A) and (B), I.R.C. 1954. Moreover, in both paragraphs (1) and (2) of sec. 902(a) the applicable apportioning fraction was maintained as dividends out of net accumulated profits over total profits net of foreign tax, which is in fact the only practical source of such distributions. See H. Rept. No. 1447, 87th Cong., 2d Sess., pp. A80–A81 (1962) (Example 2) ; S. Rept. No. 1881, 87th Cong., 2d Sess., pp. 224–225 (1962) (Example 2).

paid on the "accumulated profits" of a particular year to the extent that dividends are paid "out of" the "accumulated profits" of such year. Clearly, if a taxable dividend exceeds the amount of "accumulated profits" for the year in question, the numerator cannot exceed the amount of such "accumulated profits," and the excess of the dividend must then be allocated to the available "accumulated profits" of the most recent year or years. The respective allocation to each such year will then be regarded as the "dividends" referred to in section 902 for such year, and will serve as the numerator of the statutory fraction to be applied against the foreign taxes paid for such year in respect of that year's "accumulated profits." This is the scheme of the statute, as is indicated by section 902(c)(1). And only if such procedure were followed could a U.S. parent obtain proper credit for taxes paid by its foreign subsidiary. It was this method that was used by the Commissioner in proposing to allow a 1964 credit in the full amount of creditable foreign taxes paid in respect of the distribution of the R. T. Africa shares that was treated as a distribution of $1,925,000 of available earnings from sources other than the unrealized appreciation of such shares. Petitioner appears to be perfectly content to have the benefit of such credit for 1964, which was based, pursuant to *General Foods*, upon a series of fractions for 7 years (1958–64), no one of which was greater than one over one.

The rule of *General Foods* is equally applicable in respect of the $2,920,453 terminal dividend. The difficulty is that after making maximum use of that dividend for 1965, i.e., to the extent of $1,269,394, there were no prior years having any remaining undistributed "accumulated profits" to which the excess could be attributed. And no foreign tax credit is therefore available in respect of that excess.

A moment's reflection will reveal, however, why such result is proper, and is in accord with a carefully formulated statutory plan. The amount of the foregoing excess is $1,651,059 (see *supra*, pp. 85–86), and when there is added to this amount the $22,291 item representing that portion of the 1965 cash dividend in respect of which no foreign tax credit was allowable (see *supra*, p. 85), the sum will be $1,673,350—an amount that is equal exactly to the unrealized appreciation of the R. T. Africa shares (fair market value of $1,925,000 minus basis of $251,650).

As is evident from the foregoing, the Commissioner's method results in the allowance of credits for *all* the creditable foreign taxes paid by Robertson Holdings on its accumulated profits from the beginning of

its existence in 1952 to its liquidation in 1965.[20] The computations, however, do not provide any further credit in respect of the additional amount of $1,673,350, which had been reflected in the taxable dividends distributed by Robertson Holdings. The result, however, is not at all surprising, nor is it in any way contrary to the purpose of the statute. The Commissioner proposes to allow full credit in respect of all the creditable foreign taxes paid. The dividends in respect of which no credit is allowed are equal in the aggregate to precisely the amount of the unrealized appreciation of the R. T. Africa shares. But Robertson Holdings paid no taxes on such appreciation, and there is therefore no occasion to allow any foreign tax credit in respect thereof. To be sure, as a result of the operation of section 312(a)(3), petitioner is required to pay a U.S. tax in an amount which reflects the receipt of dividends that include such appreciation. However, Congress has, at least to some extent, provided compensatory benefits in respect thereof by giving petitioner a stepped-up basis in the R. T. Africa shares (see *supra*, p. 72, and fn. 10, *supra*, p. 75). But it has not in any way undertaken to give petitioner any foreign tax credit for foreign taxes that were never imposed or paid.

One of the difficulties in dealing with petitioner's position on this issue is that it has never made clear to us just how it would compute the foreign tax credit. To be sure, its brief pays lip service to *General Foods*, but it leaves us in doubt as to exactly how it would utilize the $2,920,453 dividend in determining the 1965 credit. The method to be employed is more than a mere computation of the sort that can be made under Rule 50; it goes to the very heart of the correct application of the statute. And it is for that reason, in large part, that we went through the laborious task of demonstrating precisely how the statute operates in connection with the 1964 dividend of the R. T. Africa shares and the cash dividend of January 20, 1965. Petitioner has never said in so many words that it advocates a fraction for 1965 in which

---

[20] It is undoubtedly true, as suggested by petitioner, that it has not in a narrow sense obtained credits in the aggregate amount of the full dollar value of the foreign taxes paid by reason of the *American Chicle* limitation. See fn. 13 *supra*. But it was entitled to the credits in respect of the creditable foreign taxes to the full extent allowable under the law. Moreover, prior to the amendment in the Revenue Act of 1962, eliminating the *American Chicle* limitation, petitioner enjoyed what Congress regarded as a "double allowance" in respect of the foreign tax credit (H. Rept. No. 1447, 87th Cong., 2d Sess., pp. 50–52; S. Rept. No. 1881, 87th Cong., 2d Sess., pp. 66–67), and the latter loophole was closed by the so-called "gross-up" requirements of sec. 78, which were added to the Code by sec. 9(b) of the 1962 Act as a companion provision to the one that eliminated the *American Chicle* limitation. Accordingly, far from being disadvantaged, prior to the 1962 Act in respect of the foreign tax credit, petitioner actually was in a position to obtain greater benefits than would otherwise have been properly available under the standards of the 1962 Act.

the numerator is equal to $2,920,453, although it repeatedly argues that the word "dividends" in section 902 means the same thing as in section 316—a position with which we do not disagree. If its argument means simply that the numerator for the 1965 fraction is, as we have held, $1,269,394 (the total amount of 1965 "accumulated profits" in excess of foreign taxes), and that the remaining portion of the $2,920,-453 dividend must be allocated to prior years in order to compute additional components of the credit, it must be rejected on the facts of this case. For there are no prior years to which that excess could be attributed, since dividends in the full amount of all the "accumulated profits" of all the prior years have already been taken into account in computing the foreign tax credits in respect thereof. And if further foreign tax credits were computed in respect of any of those years, the sum of the fractions for any such year would be in excess of one over one—a result that would be just as impermissible for any such prior year as it would be for 1965 if the entire $2,920,453 were included in the numerator of the 1965 fraction.

Petitioner has made the argument—the precise desired effect of which is not entirely clear to us—that the "accumulated profits" of any particular year is a constant and cannot be exhausted by the payment of dividends. Of course, the "accumulated profits" as it appears in the denominator of the fraction for any particular year is a constant. But the extent to which dividends can be paid "out of" that amount, i.e., the numerator of the statutory fraction, is an entirely different matter. The very words and structure of section 902(c)(1), pursuant to which the Commissioner is empowered to determine "from the accumulated profits of what year *or years*" (emphasis supplied) a dividend is paid, contemplate that for purposes of the numerator there may be situations where only a portion of the "dividend" may be attributed to a particular year and it is that portion which becomes the numerator ("dividend") of the fraction for that year. Moreover, in making the allocation of a portion of the dividend to a particular year it is plain that the portion thus allocated cannot exceed the amount of available "accumulated profits" for such year. Obviously, "accumulated profits" can thus be "exhausted" in the sense that no further dividends can be paid "out of" or "from" such profits. But this is hardly inconsistent with treating "accumulated profits" as a constant in the denominator, out of which the "dividends" in the numerator are paid.

We think it is specious to argue that since "accumulated profits" is a constant, it can never be exhausted, and therefore the amount of the dividend appearing in the numerator can never be affected by previous dividends paid out of such accumulated profits. Any such result would be destructive of the statutory scheme, and certainly could not be

reconciled with the basic theory of the *General Foods* case. We cannot find that Congress, either by design or inadvertence, provided for any such result. We hold that the language of section 902(a)(1), as read in the manner obviously intended by Congress, does not afford petitioner any double credit for creditable foreign taxes paid by Robertson Holdings. The Commissioner's position on the foreign tax credit issue must be approved. Cf. Rev. Rul. 71–65, 1971–1 C.B. 212.

*Decision will be entered under Rule 50.*